C.      The SEC Cannot Establish the Falsity Element of Its Claims

The SEC concedes that the statements at issue here are "statements of intent" (SEC Mem. 3, 17-18, 25-26) – not statements of fact. Such statements would only be false if they did not reflect the speaker's true intent when they were made. Va. Bankshares v. Sandberg, 501 U.S. 1083, 1093 (1991) (holding that to be actionable, statements of belief and opinion must be "made with knowledge that the [speakers] did not hold the beliefs or opinions expressed"); see also In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) ("It is not sufficient for [purposes of falsity and scienter] to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held") (emphasis added).

In its brief, the SEC does not challenge Defendants' "belief that they could support the Fund." It only claims this belief lacked "a reasonable basis." (SEC Mem. 17.) That contention, even if correct, would mandate denial of the SEC's motion. The Supreme Court held in Va. Bankshares that a party can only be liable for statements of intent, such as those at issue here, if actual knowledge of falsity is shown. The SEC claims that Va. Bankshares permits a statement of intent to be shown false by "facts … available to the speaker" (SEC Mem. 16), but the case says no such thing. The SEC has improperly imported the "recklessness" concept, which applies to scienter, into its discussion of falsity. In re Bank of Am. Corp. Secs., 2010 U.S. Dist. LEXIS 89199, *116 (S.D.N.Y. Aug. 27, 2010) (noting "prevailing conclusion" among District Courts in Second Circuit that recklessness cannot satisfy subjective falsity requirement).

Even under the SEC's erroneous legal standard, it cannot satisfy its summary judgment burden to show falsity. Defendants have presented ample evidence that their statements about credit support accurately reflected their intent at the time they were made and were not subject to

any undisclosed conditions.  (Ex. 2 ¶36; SEC Ex. 2, 77:19-78:2; Ex. 2-B, 90:22-91:2.)  While the SEC may disagree, it has not come forward with evidence so compelling that no reasonable juror could find in Defendants' favor.  None of the cases the SEC cites (SEC Mem. 16-17) indicate that questions about whether Defendants really intended to do what they said can be decided on summary judgment.  Va. Bankshares, supra, 501 U.S. at 1090 (interpreting jury verdict); Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (holding on appeal from motion to dismiss that "[p]lausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out ... are sufficient ... to state a claim for relief under Section 10(b)"); United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000) (reversing trial court's entry of judgment of acquittal after jury verdict where "jury could infer that Autuori's statements were representations that contradicted his honest view"); SEC v. Infinity Group Co., 212 F.3d 180, 193 (3d Cir. 2000) ("view[ing] the evidence in the light most favorable to the SEC as verdict winner").

If anything, the SEC's cases confirm what the Second Circuit has repeatedly held – that "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment." Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984); Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999) ("Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact"); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (same); accord SEC v. Caserta, 75 F. Supp. 2d 79, 93 (E.D.N.Y. 1999) ("Ascertaining one's state of mind is a quintessential factual exercise").

Given the factual nature of the intent inquiry, it is not surprising that the SEC has failed to cite a single case in which the Court found scienter as a matter of law.  What is surprising is that the SEC moved for summary judgment at all since even the cases that it cited all hold that intent presents an issue of fact which should be decided by the jury.

D.      The SEC Cannot Establish the Scienter Element of Its Claims

1.      The SEC Cannot Establish Recklessness As a Matter of Law.  Even as to the

scienter element, the SEC misapprehends the recklessness standard for securities fraud in the

Second Circuit, which requires a showing of "a state of mind *approximating actual intent,* and

*not merely a heightened form of negligence.*"  South Cherry St., LLC v. Hennessee Group LLC,

573 F.3d 98, 109 (2d Cir. 2009).  Accord Biovail, supra, 2010 U.S. Dist. LEXIS 59700, *15

(denying summary judgment where defendant's actions "may well reflect mismanagement and

possibly negligence.  Perhaps they were worse.  But this record does not compel the conclusion

that he acted with an 'egregious refusal to see the obvious, or to investigate the doubtful'"); see

In re Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011) (fraud claim

dismissed where it appeared that "Defendants simply did not anticipate the full extent of the

mortgage crisis and the resulting implications for the Pick-A-Pay loan portfolio.  Although a

colossal blunder with grave consequences for many, such a failure is simply not enough to

support a claim for securities fraud.  Bad judgment and poor management are not fraud, even

when they lead to the demise of a once venerable financial institution").

The SEC does not even remotely satisfy the recklessness standard for scienter here.

Indeed, in In re Phillips Petroleum Sec. Litig., 881 F.2d 1236 (3d Cir. 1989) – the SEC's main

case on the subject of recklessness – the court held the jury would have to decide whether

defendant was reckless in stating its intent.  The SEC cites Phillips as authority for the sweeping

proposition that, "[w]here a statement of intent is made in the fast-moving securities market, the

speaker is reckless in making it unconditional because circumstances might change that could

cause him to change his mind" (SEC Mem. 25), but the Court in Phillips articulated no such

categorical rule.  What it actually held was that, while "a subsequent change of intention will not,

by itself, give rise to a cause of action under Section 10(b) or Rule 10b-5," "a jury could ...

- 18 -

reasonably find making the statements [of intent] to be an extreme departure from the standards of ordinary care" where it is foreseeable that the defendant's intention may change. Id. at 1247 (emphasis added). Even were Phillips applicable here, the most it would establish is that intent raises a triable issue of fact – not that summary judgment is appropriate.

But the facts in Phillips are so different from the facts in this case that the SEC cannot even rely on it to create an issue of fact about whether it was reckless for Bent II to state that RMCI intended to support the Fund. The defendant in Phillips was a partnership led by corporate raider T. Boone Pickens. Between December 4 and 24, the partnership issued press releases and filed a Schedule 13-D, along with eight amendments, stating that it would "'not sell any Phillips shares owned by it back to Phillips except on an equal basis with all other shareholders.'" Id., 881 F.2d at 1239. Despite these repeated assurances, the partnership later agreed to sell its shares back to Phillips on terms different from those offered to other shareholders. The shareholders then sued for fraud, claiming that the partnership's statements were reckless. The Third Circuit held that, even though the partnership's statements of intent "needed only to be true when made," a jury could "reasonably find" "given the foreseeability of what actually occurred," that it was reckless for the partnership to repeat its unequivocal statements as the tender offer progressed, thereby reinforcing the perception that its intention would not change "no matter what." Id., 881 F.2d at 1247-1248 (emphasis added).[5]

_____

[5]    The SEC also claims that SEC v. Jakubowski, 150 F.3d 675 (7th Cir. 1998), shows Bent II was reckless in supposedly failing to read an e-mail referring to Insights as "approved." (SEC Mem. 27.) (In fact, Bent II never received the email. (Opp. Ex. U.)) In any event, the facts in Jakubowski could not be more different. Jakubowski was a Skadden attorney who filled out multiple forms stating that stock was being purchased for the account of a secretary when it was actually being purchased for a venture capital firm which could not itself have made the purchase. When Jakubowski – who was paid $50,000 for his efforts – claimed he had not read the prospectus and was unaware of any restrictions, the Court found that, even if he had not read the prospectus, the forms he personally completed stated that subscription rights could not be transferred. The Court added: "for a lawyer to fail to read a document central to a business transaction is reckless indeed." Id., 150 F.3d at 681.

Even if the Second Circuit would have reached the same result that the Third Circuit reached in Phillips – and the Second Circuit has never so much as string-cited Phillips in the 22 years since it was decided – a reasonable jury could make no comparable finding of recklessness here because what actually occurred was not foreseeable. Unlike the partnership in Phillips, Defendants in this case were not corporate raiders who deliberately made repeated disclosures over a period of several weeks in connection with a planned corporate takeover; Defendants were instead dealing with the start of an unprecedented worldwide financial crisis caused by factors of which they were unaware. They did not foresee, when they stated RMCI intended to support the N.A.V., that the market would not return to normal after the initial shock of the Lehman filing and would instead suddenly collapse, leaving the Fund with massive redemptions and without liquidity – a problem far beyond RMCI's capacity to resolve.

Recent authority establishes that the 2008 financial crisis was indeed unforeseeable. See Wachovia, supra, 753 F. Supp. 2d at 356 ("To find scienter on these facts would be to assume that the duration of the financial crisis was both inevitable and foreseeable to Defendants"); Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (defendant "could not have been expected to anticipate the [financial] crisis with the accuracy Plaintiff enjoys in hindsight"). A reasonable juror could therefore find that Defendants were not reckless for failing, in the SEC's words, to "appreciat[e] that the situation might require them to change their minds." (SEC Mem. 25.)

To establish scienter based on recklessness, the Second Circuit has required evidence showing "defendants' knowledge of facts or access to information contradicting their public statements." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). For example, in SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998), the Second Circuit affirmed an order refusing to vacate a default judgment of recklessness where there was evidence that defendant had included

false statements in SEC filings after being advised by outside counsel not to file the documents. Here, the opposite happened: when one of the Willkie layers (who was a former Director of the SEC's Division of Investment Management) was shown a draft statement saying that RMCI "intends to protect the NAV on the Primary fund to whatever degree is required" (Ex. 3-V), he did not direct RMCI not to make the statement. (Exs. 3-V; 3-K, 130:1-132:19.)

In short, the most that the SEC could possibly hope to show on recklessness would be a triable issue of fact. Either way, the SEC is not entitled to summary judgment.

2.    Defendants' Expert Reports Further Reinforce Lack of Scienter. If any of the SEC's claims survive, Defendants will offer qualified testimony from two experts – one on securities markets and the other on corporate governance – who will further rebut any inference of scienter. See SEC v. Snyder, 292 Fed. Appx. 391, 401 (5th Cir. 2008) (expert testimony may be probative, but not determinative, as to whether defendants acted with scienter). The first of Defendants' experts is Prof. Richard Painter, the S. Walter Richey Professor of Corporate Law at the University of Minnesota Law School. Prof. Painter will opine that, as a result of the Lehman bankruptcy, Defendants faced escalating problems far different from anything an investment adviser in the money market fund business had before experienced and that, in dealing with these once-in-a-lifetime events, Defendants made certain assumptions that were reasonable at the time, and certain disclosures consistent with these assumptions. (Opp. Ex. D-1.)

Defendants' other expert is Prof. Lisa M. Fairfax, the Leroy Sorenson Merrifield Research Professor of Law at the George Washington University School of Law. Prof. Fairfax will opine that the Bents' actions on September 15 and 16 – including their eight meetings with the Board, and their reliance on advice of counsel – comported with good corporate governance principles, and were inconsistent with an intent to defraud. (Opp. Ex. E-1.)

The SEC will not be able to challenge Defendants' experts' opinions with its own experts

because it retained none. Defendants' unrebutted experts reports create issues of fact that cannot be resolved on summary judgment. See SEC v. Biovail Corp., 2010 U.S. Dist. LEXIS 27604, *4 (S.D.N.Y. Mar. 18, 2010) (where parties offered opposing expert reports on falsity, "[t]his alone is sufficient to defeat this aspect of ... motion for summary judgment").

3.   A Valid Advice of Counsel Defense Exists Here.  Where a fraud claim is based on conduct the defendant was advised by counsel could properly be undertaken, reliance on such advice "has been recognized as a viable defense to scienter in securities fraud cases." Caserta, supra, 75 F. Supp. 2d at 94.  The defense "is available when the person asserting it can show that (i) he made a complete disclosure of the relevant facts to counsel; (ii) he received advice from counsel that the conduct in question was legal; and (iii) he relied on that advice in good faith." SEC v. Leffers, 289 Fed. Appx. 449, 451 (2d Cir. 2008).  Where a defendant alleges that it acted on advice of counsel, the defense generally presents a "triable issue" of fact. Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989).

Defendants can establish an advice of counsel defense here. First, all the relevant facts were disclosed to the Willkie attorneys. DiMartino and Goldberg had attended the Board meetings (Exs. 2-I; 2-J); they knew Bent Sr. told the Board he thought sufficient capital could be made available to support the Fund (Ex. 2-I); they drafted a support agreement which called for RMCI to provide $10 million in support – but could be increased (Ex. 3-R; Ex. 2-K, 67:17-25); and they knew RMCI planned to tell the public that it "intends to protect the NAV on the Primary Fund to whatever degree is required" (Ex. V).  (Indeed, the SEC is not merely trying to hold Defendants liable for actions they took in reliance on the advice of counsel, which would be bad enough, but for actions taken by counsel themselves, such as Willkie's use of a $10 million cap in the support agreement. (Exs. 3-R; 3-S.))  Second, the Willkie attorneys advised Bent II and RMCI's in-house attorney that the disclosures could be made.  (Exs. 3-E, 52:1-53:9, 57:7-

59:18; 3-F, 82:5-11; 3-V; 3-K, 130:1-132:19.) Third, Defendants strictly followed all the advice they were given. (See, generally, Defendants' Advice of Counsel Timeline.) Their reliance on the advice of counsel further precludes a finding of scienter.

4.      Ledford's Statements to Moody's Were Unauthorized and Cannot Be Imputed to RMCI. Other than the Bents, Ledford is the only specific employee whose statements the SEC seeks to impute to RMCI. There are two problems with the SEC's attempt to hold RMCI liable for Ledford's statements: 1) the statements were not within the scope of Ledford's employment; 2) Ledford's state of mind cannot be determined as a matter of law.

First, as the SEC concedes, nothing Ledford said can be imputed to RMCI unless it was within the scope of his employment. (SEC Mem. 28.) See In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) ("A principal is not charged with the acts or knowledge of an agent when the agent acts outside the scope of the agent's employment"). Although the SEC says that "[c]ommunicating with the rating agencies was one of Ledford's responsibilities as CIO" and that "the Bents were aware that Ledford performed that role" (SEC Mem. 29), the evidence actually shows that, at 10:22 A.M. on September 15, Bent II told Ledford that he and his father were "going to talk to [Moody's] at 5:00. ... [Y]ou don't need to do anything. ... We've got it covered." (Opp. Ex. K.) At a minimum, this instruction raises a factual issue about whether Ledford was authorized to speak to Moody's after 10:22 A.M. Once Moody's dealt with the Bents directly, it knew it should communicate with them – not Ledford.

Second, where an employee is acting within the scope of his authority, his conduct can only be imputed to his employer if the plaintiff can show that the employee "committed a culpable act with the requisite scienter... ." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). While the SEC has produced the transcripts of two telephone calls from which it purports to discern Ledford's state of mind, that

- 23 -

is not enough to determine whether Ledford acted with scienter, which "is considered to be subjective in nature" and inappropriate for summary disposition. SEC v. Johnson, 2005 U.S. Dist. LEXIS 4732, *9 (S.D.N.Y. Mar. 24, 2005). Ledford himself was not deposed.

As an afterthought, the SEC tacks onto its discussion of Ledford a sentence referring to unspecified "RMCI employees' knowledge about State Street's refusal to extend additional overdraft protection ... and the Fund's inability to sell sufficient assets to address that problem" – matters about which the SEC contends RMCI should have informed "the Board and the public." (SEC Mem. 29.) But RMCI had no duty to inform the public about either matter; it informed the Board about both on the morning of September 16; any failure to inform the Board would not, in any case, be actionable under §§10(b) or 17(a); and there is no evidence any RMCI employee acted with scienter concerning the disclosure of these matters.

### III. THE SEC CANNOT ESTABLISH ALL OF THE ELEMENTS OF CONTROL PERSON LIABILITY UNDER §20(a)

In Point III of its brief, the SEC finally makes clear that its control person claim seeks to hold the Bents liable for (1) their own conduct and (2) Ledford's communications with rating agencies. (SEC Mem. 34.) It cannot prevail on either theory. First, the SEC's assertion that "most of the wrongdoing by the Entity Defendants was in fact committed by Bent Sr. and Bent II" (SEC Mem. 34), even if true, would not give rise to a control person claim. In Kalnit v. Eichler, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999), aff'd, 264 F.3d 131 (2d Cir. 2001), the Court rejected a control person claim against defendants alleged to be primary violators:

> Under plaintiff's theory, however, the Directors would be primary violators rather than control persons, because primary liability may be imposed "'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" ... Therefore, ... the Directors could not be control persons and section 20(a) does not apply.

Having sued Bent II as a primary violator, the SEC cannot also seek to hold him liable for the same conduct as a control person. There is an additional reason why the SEC cannot impose

- 24 -

control person liability on Bent II based on Ledford's conduct.  To establish a prima facie claim under §20(a), the SEC would have to prove "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  Control of the primary violator requires that "[t]he Section 20(a) defendant must not only have actual control over the primary violator, but have 'actual control over the *transaction* in question.'"  In re Alstom SA Secs. Litig., 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005).

The Bents did not have actual control over Ledford's conduct and were not a culpable participant in anything Ledford allegedly did.  At 10:22 A.M. on September 15, Bent II told Ledford not to communicate with the rating agencies. (Opp. Ex. K.)  The SEC therefore cannot state a control person claim at all.  If its control person claims are not dismissed outright – as they should be – the evidence is more than sufficient for a reasonable juror to find in the Bents' favor.  The SEC should be denied summary judgment on this claim.

IV.  THE SEC CANNOT ESTABLISH A RIGHT TO RELIEF
ON ITS ADVISERS ACT CLAIMS

A.    No Violation of §§206(1) and (2) Can Be Shown

The SEC seeks to hold the Bents liable for violating §206 of the Advisers Act which only proscribes conduct by "investment advisers."  The Bents, however, were not investment advisers.  Bent II was not even a member of RMCI's Credit Committee.  (Ex. 2-A, 47:7-10; 51:8-10.)  While the Bents were both officers of RMCI, which was an investment adviser, that did not make them investment advisers, and they cannot be personally liable under §206.  SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004) ("SEC may not charge Treadway and Corba [the investment adviser's CEO] with violations of Section 206(1) or 206(2), directly, since they are not themselves investment advisers covered by the statutory

provisions").

The SEC's discussion of the facts relevant to its Advisers Act claims is also flawed, beginning with its assertion that "RMCI, Bent Sr., and Bent II withheld critical information from the Trustees on September 15." (SEC Mem. 31.) This is followed by a list of seven pieces of information the SEC claims it is "undisputed" Defendants withheld. As with the balance of the SEC's factual recitation, nothing the SEC calls "undisputed" here is actually undisputed. Indeed, the SEC cannot establish the most basic fact that anything was withheld. For the proposition that "information was not shared with the Board" on September 15, the only evidence the SEC offers is the 1:00 P.M. Board minutes. (SEC Rule 56.1 Statement ¶¶96-100, 103-106.) As Bent Sr. has explained, and the SEC well knows: "Minutes of a board are the synthesis of what was said. It's not a verbatim recitation." (Ex. 2-B, 112:17-18). Here, the audio recordings of the first two Board meetings on September 15, 2008 bear this out, as they show far more information being conveyed than the minutes reflect. (Exs. 2-G; 2-H; 2-I.) And even for the unrecorded meetings, the testimony from the participants does not support the SEC's theories:

- *Alleged Board Non-Disclosure #1*: *"State Street's warning on September 12 that it 'may have difficulties [funding redemptions] Monday morning'; its suspension of funding for redemptions requested after approximately 10:10 a.m.; and its communicated overdraft limit for the Reserve on September 15."*

The Facts: On the audio recording of the 9:30 A.M. Board meeting, Bent II is heard telling the Board that "our custody bank [State Street] is not necessarily sending out wires [in payment of redemption requests] as soon as they get instructions from us." (Ex. 2-H, p. 16:11-13.) The Board thus knew of redemption delays early Monday morning.

State Street did not suspend "funding for redemptions requested after approximately 10:10 a.m." The data shows that State Street was still wiring out redemption payments as late as 5:28 p.m. that day for redemption requests made as late as 1:24 p.m. (See Ex. 4 ¶2; Ex. 4-A.)

Nor did State Street communicate an "overdraft limit for the Reserve on September 15." Rather, a State Street officer is recorded telling RMCI that that the "2:30 timeframe is probably a safe bet" for all wires to go out. (Ex. 4-E.) At the 10:00 A.M. meeting the next morning, the Board was told State Street did not want to keep extending the overdraft. (Ex. 2-J p. 1.)

If what the SEC is alleging is that Defendants violated §§206(1) and (2) by failing to convene a ninth Board meeting in order to discuss State Street developments sometime between 1:00 P.M. on September 15 and 10:00 A.M. on September 16, it is not clear what the SEC would have had Defendants disclose or what it thinks the Board could have done. For much of September 15, State Street sent mixed signals, and Bent II tried to get clarification from State Street into Monday evening. State Street itself did not seem to know what to do: an internal e-mail sent at 6:24 P.M. on September 15 indicates that it did not update RMCI because it was "[s]till a very confusing picture." (Ex. 4-I.)

It is well-settled that managers may take a "reasonable time" to properly inform themselves before disclosing potentially negative information. Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal"). "Defendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises." In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008). Here, Bent II knew nothing definitive until 7:00 P.M. on Monday, and he timely reported that information to the Board at 10:00 A.M. on Tuesday morning. (Ex. 2-J.)

The SEC cites no authority suggesting that a violation of §§206(1) and (2) occurs when, in the heat of a financial crisis, an investment adviser discloses information to a fund's Board at 10:00 A.M. on a Tuesday rather than at 5:00 P.M. the prior evening. Neither of the only two

cases it mentions in discussing §§206(1) and (2) is even remotely comparable: SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008), rev'd on other grounds, 597 F.3d 436 (1st Cir. 2010), involved an investment adviser who was held liable under §206 for knowingly allowing preferred investors to engage in short-term and excessive trading to the detriment of long-term investors, and SEC v. Batterman, 2002 WL 31190171, *8 (S.D.N.Y. Sept. 30, 2002), involved an investment adviser who failed to disclose that he was a felon who had previously been sanctioned by the SEC and the New York Stock Exchange, and then misrepresented the fund's performance. (SEC Mem. 31.) That these are the only cases the SEC was able to find should tell the Court all it needs to know about whether an investment adviser has ever been held liable under §§206(1) and (2) for anything like the conduct alleged here.

- *Alleged Board Non-Disclosure #2*: *"The Fund had incurred an $8 billion debt [i.e., daylight overdraft] to State Street."*

The Facts: This claim does not appear anywhere in the SEC's self-proclaimed "detailed" Complaint (Opp. Ex. M, p.1) and did not surface until summary judgment. As Defendants note in their preclusion motion, the law prohibits the SEC from ambushing Defendants in this manner. Even were the Court to consider this untimely argument, daylight overdraft is common industry practice, and there is no evidence the Board did not know about it here. The SEC only cites to the 1:00 P.M. September 15 Board minutes, but that document reflects that CFO Farrell made a presentation on redemption issues, which necessarily would have included the subject of State Street's daylight overdraft. (Ex. 2-I pp. 3-4.) The overdraft issue is also expressly identified in the minutes of the 10:00 A.M. Board meeting on September 16. (Ex. 2-J, p. 1.) Since the Board did nothing based on that disclosure, there is no reason to believe that a slightly earlier disclosure of the exact same information would have been material.

- *Alleged Board Non-Disclosure #3*: *"Lehman commercial paper was trading at levels far below the .80 fair value that the Board had assigned to the Fund's Lehman paper."*

The Facts:  Michael Luciano, RMCI's then-Portfolio Manager, explains in his declaration (Opp. Ex. B) that there were no institutional trades of Lehman paper on September 15-16, a fact CIO Ledford accurately conveyed to the Board. (Ex. 2-H, p. 4; Opp. Ex. B-2, pp. 5-7.)  What the SEC is pointing to, by contrast, are individual trades, most for $50,000 or less.  (SEC Ex. 105 at Exs. B-E.)  Luciano was not aware of those trades, nor would they have been meaningful to him, as he needed an institutional buyer for $785 million of paper. (Opp. Ex. B)

There is no question that these small individual trades would not have been material to the Board either:  Montgoris expressly confirmed as much.  As the former CFO and COO of Bear Stearns, he was in a position to understand the significance of trades, and he testified that "one of the things we discussed was if you could sell the Lehman paper at the best price you could, if it was significant amounts of paper that would be a consideration that we would use in determining market value.  If it was small pieces that really were not indicative of what you could sell 750 million for, that would not be indicative of a price to us... ." (Opp. Ex. H: 90:7-19.)  Since this testimony undermines its claim, the SEC simply ignores it.

- *Alleged Board Non-Disclosure #4*:  *"The ratings agencies had expressed concerns about maintaining the Fund's ratings."*

The Facts:  Once again, the SEC provides no evidence for its claim that this information was withheld from the Board.  In any event, when asked if he would have wanted to know about a rating downgrade on September 15, Montgoris answered (Opp. Ex. H, 23:24-24:10):

> A.    I'm going to kind of stick with the answer I gave you because with all the turmoil that was taking place on the 15th, if one of the rating agencies was going to call and say that they were thinking about downgrading the fund, that would have been very low on the scale of information that I would have wanted to know about.

As this testimony shows, rating agency information was not material to the Board.

- *Alleged Board Non-Disclosure #5*:  *"Management had instructed that no sales of assets be made at less than par."*

The Facts:  This alleged non-disclosure is not hinted at in the Complaint and thus represents another post-discovery attempt by the SEC to supplement its pleadings.  As evidence of non-disclosure, the SEC again cites only the minutes.  The SEC could have asked Bent II at any of his four SEC examinations whether he told this to the Board, but chose not to.  Goldberg – one of the Fund's attorneys – was certainly aware of the decision.  (Ex. 3-EE.)  In any event, the SEC offers no explanation as to why RMCI's decision <u>not</u> to sell assets at a loss would have been material.  That was standard practice in the money market fund business.

- *Alleged Board Non-Disclosure #6*:  *"Bent II had made overtures to investment bankers about selling RMCI and to the Fed for help."*

The Facts:  The minutes of the 10:00 A.M. September 16 meeting reflect that both of these facts were fully disclosed to the Board.  (Ex. 2-J p. 2.)  The SEC does not explain why earlier disclosure would have been material.  Given that the Board did nothing with that very information once it was received, but instead held five more meetings before re-pricing the NAV, such information is *per se* immaterial.  Indeed, Montgoris testified at his investigative deposition that, whatever bad news came its way, the Board was not going to drop the NAV until it definitely heard from the Fed that no help would be forthcoming (Opp. Ex. H, 23:24-24:10):

> in my best business judgment it didn't make any sense to change the valuation of the Lehman paper until we had explored every avenue that was available... . I wouldn't say I was optimistic that anything was going to happen with the Fed but we did have the conversation and it was certainly I thought worth the effort.

It was only when the Fed delivered that news late in the afternoon on September 16 that it was not going to help the Fund that the Board finally acted.  (Ex. 2-J p. 7.)

- *Alleged Board Non-Disclosure #7*:  *"International Liquidity's and Yield Plus Funds' NAVs fell below $1.00 during the 9:30 a.m. Board meeting after the Lehman holdings were reduced to 80 percent of par."*

The Facts:  Here, too, the SEC ignores evidence that undermines its position.  Montgoris testified that he would not have expected to discuss the International Liquidity Fund because

"we're not trustees of International Liquidity." (Opp. Ex. H, 39:3-6.) As for Yield Plus, Montgoris testified that it would not have been significant because "again my understanding of Yield Plus was that it was not a guaranteed dollar NAV fund, so I'm not sure that there were any actions that I knew about that the board would be required to take if Yield Plus broke the buck." (Opp. Ex. H, 104:21-105:1.) No material information was withheld.

In any event, the Board was told at the 8:00 A.M. meeting that Yield Plus held 2.57% of its assets in Lehman. (Ex. 2-G, p. 12.) As Montgoris testified, when the Board wrote down the Lehman paper by 20% at the 9:30 A.M. meeting, it understood the write-down to apply "equally to ... any [other] funds that held Lehman paper." (Opp. Ex. H, 39:16-19.) The Trustees did not need the Bents to tell them that 20% of 2.57 = 0.514, or more than a half percent.

B.    The SEC Has Not Established an Entitlement to Judgment on Its §206(4) Claim

The SEC does not devote much effort to its §206(4) claim. Its entire discussion consists of a conclusory argument that, since the claim is based on the same facts as its claims under §§10(b) and 17(a), but does not require proof of scienter, it is "patently obvious" that it should prevail. (SEC Mem. 33.) However, the SEC still has to establish a material misstatement or omission under §206(4). As shown in Point II(B) above, the "determination of materiality is a mixed question of law and fact that generally should be presented to a jury." Press, supra, 166 F.3d at 538. And, as shown in Point II(C) above, there is a factual dispute as to whether there were any actual misstatements. Thus, the SEC is not entitled to summary judgment.

### V.  THE SEC HAS NOT SHOWN AN ENTITLEMENT TO ANY OF THE RELIEF REQUESTED

A.    The SEC Has No Evidence That an Injunction Is Necessary to Prevent a Recurrence

Unfazed by the Second Circuit's clear holding that the SEC "cannot obtain [injunctive] relief without positive proof of a reasonable likelihood that past wrongdoing will recur," SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1977), the only "proof" the SEC offers is the very

conduct alleged in this case. (SEC Mem. 35-36.) That does not satisfy its burden.

To justify its failure to come forward with anything beyond the allegations in this case, the SEC quotes a sentence from SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975), that "the commission of past illegal conduct is highly suggestive of the likelihood of future violations." (SEC Mem. 35.) While that may have been the law in 1975, it is not the law now. Two years after Mgmt. Dynamics was decided, the Second Circuit held that "[o]ur recent decisions have emphasized, perhaps more than the older ones, the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978) (emphasis added). The SEC has not done so here for a simple reason: it cannot. Defendants faithfully and successfully ran their business for forty years without any major issue until the 2008 financial crisis. Even the alleged misconduct, taken at face value, barely lasted a day.

Where, as here, the alleged misconduct is isolated in nature and limited in duration, there is no likelihood of recurrence, and an injunction cannot be granted. SEC v. Jadidian, 2011 U.S. Dist. LEXIS 36485, *16 (S.D.N.Y. Mar. 31, 2011) (injunction denied because "this Court must conclude that the TTCN episode – which took place over approximately one month – was an 'isolated occurrence'"); SEC v. Jones, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) (injunction denied where SEC "adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent violation'").

The SEC even goes so far to use the Bents' exemplary careers against them, claiming that "courts have concluded that a defendant's experience in the industry increases the likelihood of further violations." (SEC Mem. 36 n. 20.) But the cases from which the SEC distills this dubious generalization reached no such conclusion. In SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006), for example, what the Court concluded was that defendants were reasonably

- 32 -

likely to violate the securities laws again based on "the broad scope of the scheme [which lasted four years], defendants' familiarity with securities trading, and the lengths to which defendants went to conceal their activities." The SEC has thus grossly mischaracterized Svoboda.

Other factors also militate against an injunction here: 1) it was Defendants who brought this matter to the SEC's attention on September 16; 2) Defendants sought professional advice throughout the relevant time period; and 3) Defendants were entrusted with winding up the Fund, a process they oversaw for two years and which resulted in the distribution of billions of dollars to investors who have now been paid 99¢ on the dollar for their shares.

B.      The SEC Admits That It Has No Evidence of Any Ill-Gotten Gains

Even at the summary judgment stage of this case, the basis of the SEC's claim for disgorgement remains a mystery. Because Defendants knew they had received no profits tied to any alleged wrongdoing, they repeatedly asked the SEC to explain its disgorgement theory, first by way of interrogatory and then by way of Rule 30(b)(6) deposition. (Opp. Exs. N, pp. 5-6; O, p. 5.) The SEC rebuffed both requests. Now, with no evidence to satisfy its burden of showing specific profits that it claims are subject to disgorgement, Jones, supra, 476 F. Supp. 2d at 386, the SEC says it is Defendants' fault that it "can only approximate Defendants' ill-gotten gains." (SEC Mem. 37.) But the SEC has not even gone through the pretense of an approximation, since it well knows there are no "ill-gotten" gains to approximate.

This utter failure of proof cannot be blamed on Defendants. Although the SEC has the burden of proof on the issue, SEC v. Johnson, 2006 U.S. Dist LEXIS 50307, **22-23 (S.D.N.Y. July 21, 2006), it conducted no discovery concerning profits and never attempted to determine whether there was a basis for asserting that Defendants had been unjustly enriched. The record contains no evidence of any "ill-gotten gains," which, by definition, includes only the part of Defendants' "compensation causally connected to the alleged violations." SEC v. Kelly, 2011

U.S. Dist. LEXIS 3290, *60 (S.D.N.Y. Jan. 7, 2011).

As for the SEC's allusion to Defendants' "conflicting submissions concerning the profits they claim they earned" (SEC Mem. 37), they are non-existent. The only "submissions" of which Defendants are aware are analyses of Defendants' expenses prepared to meet the SEC's ever-changing preconditions to authorizing the payments that Defendants were promised if they continued managing the Fund.[6] All show that Defendants have advanced millions of dollars in expenses to the Fund which have yet to be reimbursed, and they are also owed management fees, no part of which can be attributed to any wrongdoing. (Ex. 5 ¶¶4-8.) Rather, the SEC is seeking disgorgement of payments due for post-liquidation work which would had to have been done whether or not any alleged misstatements were made. (Ex. 5 ¶¶ 4-8.)

Nor is there any legal basis for the SEC's notion that a defendant charged with securities fraud forfeits the right to all compensation, even compensation not causally connected to an alleged violation. Kelly, supra, 2011 U.S. Dist. LEXIS 3290, *58 ("because the disgorgement remedy is remedial, rather than punitive, a court cannot order disgorgement of an amount above that which was wrongfully acquired"). The SEC nevertheless demands that the Bents' salaries be disgorged (SEC Mem. 37 n. 21) – something that not only flies in the face of the law, but also represents a 180-degree turn by the SEC, which told the Court that it has "never asserted that the Bents should be required to work for free." (Opp. Ex. P.) The SEC's position, beyond being without any legal basis, would set a terrible precedent. Fund managers who stick with their fund and its shareholders in a crisis should not be punished for their efforts.

---

[6] The document the SEC attributes to Defendants' damage expert (SEC Mem. 37 n.21) is not his report on this issue and does not suggest that Defendants have been paid $8 million in profits, much less that such amount is connected to the alleged wrongdoing. (SEC Ex. 94.) It simply calculates the component of RMCI's management fee that would be profit, if the fee were paid in full. Defendants' expert further concludes that none of that profit would be attributable to alleged fraud (Opp. Ex. F-1), a conclusion the SEC has not sought to rebut.

C.    The SEC's Request for Penalties Is Unsupported By the Law
      and Based on Arguments It Should Be Estopped From Making

The SEC acknowledges (SEC Mem. 38) that one of the factors courts consider in determining whether a civil penalty should be imposed at all is "whether the defendant's conduct was isolated or recurrent." SEC v. Sheyn, 2010 WL 3290977, *8 (S.D.N.Y. Aug. 9, 2010). Even though it is undisputed that the conduct alleged here was isolated in the extreme, the SEC seeks the highest tier of penalties. It then tries to inflate that penalty by multiplying it by the number of investors supposedly "affected by the wrongdoing" (SEC Mem. 39) – a number it does not specify. This formula is all but unprecedented. While it was mentioned in SEC v. Invest Better 2001, 2005 WL 2385452 (S.D.N.Y. May 4, 2005), a case involving "a Ponzi-style investment fraud" which has nothing in common with this case, it was not actually applied there. The only case the SEC cites in which the formula was applied is SEC v. Kenton Capital, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998). But the Court there made clear that the defendant did not object to the formula, which represented the lesser of the SEC's two proposed penalties.

As support for the extraordinary penalty it seeks, the SEC argues that "some investors were forced to incur substantial expenses borrowing money to meet their needs for cash." (SEC Mem. 39.) It should not be allowed to make this claim. Until this motion, the SEC consistently took the position that "investor loss is not an issue here." (Opp. Exs. Q, R.) By doing so, the SEC blocked Defendants from conducting any discovery on the issue. It cannot take a different position now in the hopes of obtaining a larger penalty. Intellivision v. Microsoft Corp., 2011 U.S. Dist. LEXIS 29950, **13-22 (S.D.N.Y. Mar. 23, 2011) (judicial estoppel applied where party took position after close of discovery contradicting earlier representations).

CONCLUSION

For all the reasons set forth above and in the accompanying materials, the SEC's motion should be denied, and summary judgment should instead by granted in Defendants' favor.

Dated: New York, New York
     June 13, 2011

               Respectfully submitted,

               DUANE MORRIS LLP

               By:_____/s/ Fran M. Jacobs_____
                       Fran M. Jacobs
                       John Dellaportas
                       Kathrine A. Gehring
               1540 Broadway
               New York, NY  10036
               (212) 692-1000
               Attorneys for Defendants Reserve Management
                 Company, Inc., Resrv Partners, Inc., Bruce R.
                 Bent, Sr. and Bruce R. Bent II

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | No. 09 Civ. 4346 (PGG) |
| | ECF Case |
| RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II, | |
| Defendants, | |
| and | |
| THE RESERVE PRIMARY FUND, | |
| Relief Defendant. | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DUANE MORRIS LLP
1540 Broadway
New York, NY  10036
(212) 692-1000
Attorneys for Defendants
Reserve Management Company, Inc. Resrv Partners,
Inc., Bruce R. Bent, Sr. and Bruce R. Bent II

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT............................................................... 1

MATERIAL UNDISPUTED FACTS....................................................... 3

    A.    Background........................................................... 3

    B.    The 8:00 A.M. Board Meeting...................................... 4

    C.    The 9:30 A.M. Board Meeting...................................... 5

    D.    The 1:00 P.M. Board Meeting...................................... 5

    E.    Bent II's 1:19 E-mail.............................................. 8

    F.    The Insights Piece................................................. 11

    G.    State Street Had Not Stopped Funding Redemptions........................... 13

    H.    Communications With Rating Agencies........................................ 14

    I.    As Soon As Defendants Realized a Support Agreement Was Not
Feasible, They Immediately Advised Counsel, Their Regulator,
and The Board........................................................ 14

    J.    The Board's 10:00 A.M. Meeting On September 16........................... 15

THE COMPLAINT....................................................... 16

ARGUMENT – SINCE THE SEC CANNOT ESTABLISH ESSENTIAL ELEMENTS
    OF ITS CLAIMS, SUMMARY JUDGMENT SHOULD BE
    ENTERED IN DEFENDANTS' FAVOR........................................ 16

    I.    THE APPLICABLE LEGAL STANDARD.................................... 16

    II.    THE SEC CANNOT ESTABLISH ALL OF THE ELEMENTS
        OF ITS SECTION 10(b) and 17(a) CLAIMS.................................. 17

        A.    Statements Intended to Induce Investors Not to Redeem Are
        Not Actionable Because They Do Not Satisfy the "In Connection
        With a Purchase or Sale" Requirements.................................. 18

B.   The "In Connection With" Requirement Cannot Be Satisfied By Relying on Purchasers to Whom no Representations Were Made ....... 19

C.   The Alleged Misrepresentations Were Not Material Because, No Matter What Defendants Said, Investors Could Not Have Redeemed and Because Purchasers Did Not Treat the Statements as Important ..... 20

D.   Because There Is No Evidence That Defendants' Statements Did Not Accurately Reflect Their Intent At the Time, the SEC Will Be Unable to Prove Scienter ............................................... 23

E.   There Can Be No Aider and Abettor Liability .............................. 24

F.   There Can Be No "Control Person" Liability ................................ 24

III.   THE SEC CANNOT PREVAIL ON ITS CLAIMS UNDER THE ADVISERS ACT ............................................................. 24

A.   Since The Bents Were Not Themselves Investment Advisers, They Cannot Be Liable for Violating the Advisers Act .................... 24

B.   The Evidence Does Not Support an Advisers Act Claim Against RMCI ............................................................... 26

IV.   THE SEC CANNOT PRODUCE EVIDENCE ESTABLISHING THAT THE BENTS AIDED AND ABETTED VIOLATIONS OF SECTION 206 AND, EVEN IF IT COULD, CIVIL PENALTIES CANNOT BE IMPOSED ............................................................. 29

A.   The SEC Cannot Adduce Evidence Which Supports An Aiding and Abetting Claim Under the Advisers Act .................... 29

B.   There is No Legal Authority for Imposing Civil Penalties on A Defendant for Aiding and Abetting a Violation of the Advisers Act ......... 30

V.   DISGORGEMENT IS UNAVAILABLE AS A REMEDY BECAUSE THE SEC HAS NO EVIDENCE OF ANY "ILL-GOTTEN GAINS" ............................................................. 31

VI.   THE SEC CANNOT RECOVER MORE THAN THE FIXED PENALTIES BECAUSE DEFENDANTS HAD NO PECUNIARY GAIN .... 32

VII.   INJUNCTIVE RELIEF IS NOT WARRANTED GIVEN THE INDISPUTABLY ISOLATED NATURE OF DEFENDANTS' ALLEGED WRONGDOING ............................................................. 33

CONCLUSION ............................................................. 34

TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

Aaron v. SEC,
    446 U.S. 680 (1980)...............................................................................................23

Abrahamson v. Fleschner,
    568 F.2d 862 (2d Cir. 1977)..................................................................................18

ATSI Comms., Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007)....................................................................................24

Basic, Inc. v. Levinson,
    485 U.S. 224 (1988)........................................................................................ 20-22

Bischoff v. G.K. Scott & Co., Inc.,
    687 F. Supp. 746 (E.D.N.Y. 1986) .......................................................................18

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)...............................................................................................17

Crummere v. Smith Barney, Harris Upham & Co. Inc.,
    624 F. Supp. 751 (S.D.N.Y. 1985) .......................................................................19

Feit v. Leasco Data Processing Equip. Corp.,
    332 F. Supp. 544 (S.D.N.Y. 1971) .......................................................................21

Gambella v. Guardian Investor Services Corp.,
    75 F. Supp. 2d 297 (S.D.N.Y. 1999).....................................................................18

Goldstein v. SEC,
    451 F.3d 873 (D.C. Cir. 2006)..............................................................................26

Greenspan v. Del Toro,
    1974 U.S. Dist. LEXIS 8475 (S.D. Fla. May 17, 1974) ......................................26

Gurary v. Winehouse,
    190 F.3d 37 (2d Cir. 1999)....................................................................................23

Higginbotham v. Baxter Int'l, Inc.,
    495 F.3d 753 (7th Cir. 2007) ................................................................................28

Madison Consultants v. FDIC,
    710 F.2d 57 (2d Cir. 1983)....................................................................................21

Nobles v. First Carolina Communications, Inc.,
    929 F.2d 141 (4th Cir. 1991) ................................................................................21

In re Phillips Petroleum Secs. Litig.,
    881 F. 2d 1236 (3d Cir. 1989)................................................................................23

Pommer v. Medtest Corp.,
    961 F.2d 620 (7th Cir. 1992) ...............................................................................23

Santa Fe Indus. Inc. v. Green,
    430 U.S. 462 (1977).............................................................................................21

SEC v. Adoni,
    60 F. Supp. 2d. 401 (D.N.J. 1999) ......................................................................19

SEC v. Bausch & Lomb, Inc.,
    565 F.2d 8 (2d Cir. 1977)........................................................................ 22, 33-34

SEC v. Bolla,
    401 F. Supp. 2d 43 (D.D.C. 2005),
    aff'd in relevant part, 475 F.3d 392 (D.C. Cir. 2007) ........................................28

SEC v. Bolla,
    550 F. Supp. 2d 54 (D.D.C. 2008) ......................................................................30

SEC v. Commonwealth Secs., Inc.,
    574 F.2d 89 (2d Cir. 1978)...................................................................................33

SEC v. First Jersey Sec., Inc.,
    101 F.3d 1450 (2d Cir. 1996)...............................................................................17

SEC v. Gabelli,
    2010 U.S. Dist. LEXIS 27613 (S.D.N.Y. Mar. 17, 2010) ..........................29-30, 33

SEC v. Jadidian,
    2011 U.S. Dist. LEXIS 36485 (S.D.N.Y. Mar. 31, 2011) ...............................17, 33

SEC v. Johnson,
    2006 U.S. Dist. LEXIS 50307, ** 22-23 (S.D.N.Y. July 21, 2006)......................32

SEC v. Jones,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007)...............................................................31, 33

SEC v. Kelly,
    2011 U.S. Dist. LEXIS 3290 (S.D.N.Y. Jan. 7, 2011)................................ 17, 31-32

SEC v. Monarch Funding Corp.,
    192 F.3d 295 (2d Cir. 1999)...................................................................................17, 27

SEC v. Northshore Asset Mgmt.,
    2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008)............................................18

SEC v. Norton,
    1997 U.S. Dist. LEXIS 15167 (S.D.N.Y. Sept. 30, 1997).........................................19

SEC v. Norton,
    21 F. Supp. 2d 361 (S.D.N.Y. 1998)........................................................................31

SEC v. PIMCO Advisors Fund Mgmt., LLC,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004).......................................................... 24, 26-27

SEC v. Rorech,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010).......................................................................17

SEC v. Steadman,
    967 F.2d 636 (D.C. Cir. 1992)............................................................................29, 34

SEC v. Tecumseh,
    2009 U.S. Dist. LEXIS 119869 (S.D.N.Y. Dec. 22, 2009) ......................................30

SEC v. Texas Gulf Sulphur, Inc.,
    401 F.2d 833 (2d Cir. 1968) ....................................................................................22

Stransky v. Cummins Engine Co., Inc.,
    51 F.3d 1329 (7th Cir. 1995) ...................................................................................23

TCS Capital Mgmt., LLC v. Apax Partners, L.P.,
    2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) .........................................21

United States v. Margala,
    662 F.2d 622 (9th 1981)...........................................................................................21

Statutes

15 U.S.C. § 77t(d) ...........................................................................................................33

15 U.S.C. § 78u(d) ..........................................................................................................33

15 U.S.C. § 80b-2(11).....................................................................................................25

15 U.S.C. § 80b-6 ...........................................................................................................24

15 U.S.C. § 80b-7 ..................................................................................................................25

15 U.S.C. § 80b-9(e) .............................................................................................................33

Other Authorities

Fed. R. Civ. P. 56 .................................................................................................................16

17 C.F.R. § 275.206(4)-8, Rule 206(4)-8 .......................................................................16, 24, 29

Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Partners"), Bruce Bent II ("Bent II"), and Bruce Bent, Sr. ("Bent Sr.") (together, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing the Complaint of plaintiff Securities and Exchange Commission (the "SEC") on the grounds that (1) the SEC cannot establish essential elements of its claims and (2) there is no legal or factual basis for the relief the SEC seeks.

## PRELIMINARY STATEMENT

The premise of the SEC's case is that Defendants made fraudulent statements in order to stop investors from continuing to redeem shares in the Reserve Primary Fund (the "Fund") in the 19-hour period between 1:00 P.M. on September 15, 2008 – the day that Lehman Brothers' bankruptcy filing set off a global financial crisis – and 8:00 A.M. the following morning. (Complt. ¶ 6; see also Id. at ¶¶ 9, 45, 82, 86, 110.)  Even if the SEC had proof to support this theory, and it has none, summary judgment would still have to be granted in Defendants' favor because of two gaping holes in the SEC's case.

First, the SEC cannot establish fraud "in connection with the purchase or sale of a security," as required by Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 17(a) of the Securities Act of 1933 (the "Securities Act").  As a matter of black letter law, statements designed to induce investors to hold onto securities instead of redeeming them cannot satisfy the "in connection with the purchase or sale" requirement and therefore are not actionable under §§ 10(b) and 17(a).

Second, the SEC cannot establish materiality, another essential element of each of the its claims.  Because it is undisputed that investors could not have redeemed Fund shares after 1:33 P.M. on September 15, 2008, the misstatements allegedly made to investors thereafter to induce them not to redeem – when they could not have redeemed anyway – are immaterial as a matter of

law.

The SEC's inability to satisfy the "in connection with" and materiality requirements of Sections 10(b) and 17(a) by themselves warrant the entry of summary judgment in Defendants' favor. But the SEC also cannot establish scienter. The evidence simply does not show that Defendants made any misstatements with the requisite fraudulent intent.

Even if the SEC's claims were viable, Defendants would still be entitled to summary judgment dismissing the relief the SEC is seeking – disgorgement, a permanent injunction, and civil penalties. Disgorgement can only be awarded where there is a direct connection between the allegedly illegal conduct and the receipt of some ill-gotten gains. (The same holds true for civil penalties beyond the fixed amounts in the applicable statutes, which require a "pecuniary gain . . . as a result of the violation.") No such connection can possibly be shown in this case because Defendants received no ill-gotten gains – and the SEC has no evidence (or even a theory) that they did.

Injunctive relief, in turn, requires proof of a reasonable likelihood that the alleged past wrongdoing will recur. Here, RMCI and Resrv are no longer in the securities business, and the two Bents' alleged misconduct was confined to an extraordinarily short period of less than 24 hours while they were attempting to cope with the effects of a once-in-a-lifetime worldwide financial crisis. Under these circumstances, the SEC cannot possibly put forward evidence that an injunction is needed to prevent a cognizable danger of recurrence.

Given all these legal deficiencies, it is not clear why the SEC chose to bring securities fraud claims against Defendants. Whatever the SEC's goal may be, it cannot establish essential elements of each of its claims, nor justify its proposed relief, and summary judgment should therefore be entered dismissing the Complaint.

## MATERIAL UNDISPUTED FACTS[1]

### A.   Background

Bent Sr. was, until November 2010, the Chairman of the Fund, and he remains the Chairman of RMCI, which was the Fund's investment adviser.  More than forty years ago Bent Sr. co-invented the concept of money market funds, and he has been in the money market business ever since.  Until Lehman filed for bankruptcy on September 15, 2008, none of Defendants' money funds had ever experienced a credit default.  (Bent Sr. Decl. ¶ 3.)

As soon as Lehman's bankruptcy filing appeared imminent on the evening of September 14, 2008, Bent II began to seek guidance about how the filing would affect the Fund, which owned $785 million of Lehman commercial paper.  At the time, Bent II was the Fund's Vice Chairman and Co-Chief Executive Officer as well as the Vice Chairman and President of RMCI and Vice Chairman of Resrv, the Fund's broker-dealer.  Bent II had never before had to deal with an investment in a bankrupt issuer.  (Bent II Decl. ¶ 3.)

At 9:18 P.M., he spoke to Catherine Crowley ("Crowley"), RMCI's General Counsel, to discuss convening a meeting of the Fund's Board.  (Bent II Ex. A.)  Bent II was on one call after another until 10:56 P.M., tried unsuccessfully to reach his father (who was then on a flight to Italy) at 1:06 A.M., and started fielding calls again at 3:47 A.M. the next morning when his father arrived in Italy.  By 6:28 A.M. on the morning of September 15, Bent II had notified the Board that it would have to meet "this morning ASAP to consider using fair valuation for the Lehman paper that our funds currently hold which totals approximately $800 million."  (Bent II Ex. B.)  In between, Bent II did not sleep.  (Bent II Decl. ¶ 3.)

The fact that the Fund held Lehman paper was not news to the Board.  At the Board's last

---

[1]      The following undisputed facts are drawn from the pleadings, sworn testimony, and contemporaneous documentary evidence, as more fully discussed in the accompanying declarations of Bent Sr., Bent II, David Gareis, and Daniel Boruch.

quarterly meeting on September 10, 2008, RMCI's Chief Investment Officer, Patrick Ledford ("Ledford"), reported that the Fund had 1.1% of its assets in Lehman debt, which he believed was safe. (Bent Sr. Ex. F.) Investors also knew the Fund held Lehman paper. The Fund's most recent SEC filing disclosed all the Fund's Lehman holdings, and the Fund made a holdings list available on demand – something no other money fund did at that time. (Bent Sr. Decl. ¶ 8.)

The Fund's investment in Lehman was not only fully disclosed, it complied with all applicable SEC money fund investment guidelines: Lehman paper was highly rated and the Fund's holdings fell well below the maximum permissible amount of securities of any one issuer. (Bent Sr. Decl. ¶ 8.) Indeed, although the SEC has leveled all sorts of charges against Defendants, none of its claims alleges that the investment in Lehman paper was wrongful. That lawful investment, and not the conduct alleged in the Complaint, is what caused the collapse of the Fund.

B.      The 8:00 A.M. Board Meeting

On September 15, 2008, the Fund had eight trustees, all but one of whom – Bent Sr. – was independent. The Independent Trustees were sophisticated individuals, and some had extensive experience in the financial markets. One had been the Chief Operating Officer of Bear Stearns for twenty years; another had been an executive vice president and senior managing director of Smith Barney. (Bent Sr. Decl. ¶ 5.) As might be expected from their backgrounds, the Independent Trustees actively participated in Board meetings.

Six trustees took part in the 8:00 A.M. telephonic meeting on September 15, including Bent Sr. who called in from Italy where he and his wife were celebrating a milestone anniversary. (Bent Sr. Decl. ¶ 11.) According to the minutes (Bent Sr. Ex. I), the following individuals also attended the 8:00 A.M. Board meeting:

- Stuart Strauss ("Strauss") of Clifford Chance, the Independent Trustees' counsel and an experienced Investment Company Act lawyer;

-4-

- Joel Goldberg ("Goldberg"), a former Director of the SEC's Division of Investment Management and partner at Willkie Farr & Gallagher ("Willkie"), which acted as counsel for both the Fund and RMCI;

- Rose DiMartino ("DiMartino"), Goldberg's partner at Willkie;

- Sean McKee of KPMG, LLP, the Fund's auditing partner;

- RMCI's Chief Investment Officer (Ledford);

- Fund Secretary and RMCI's General Counsel (Crowley);

- Patrick Farrell ("Farrell"), RMCI's Chief Financial Officer;

- Christine Massaro ("Massaro"), RMCI's Chief Compliance Officer; and

- Bent II, and his brother, Vice Chairman Arthur Bent.

Bent Sr. began the meeting by stating that, based on the Fund's total assets, its net asset value ("NAV") would drop below $0.995 if Lehman were valued at 55% of par, causing the Fund to break the buck. During the same meeting, Bent II reported that investors had already placed $5.2 billion in redemption orders, presumably because of the Fund's Lehman holdings, and Bent Sr. added that "as the assets of the fund go down, the more significant the Lehman holdings become relative to the total assets of the fund." (Bent Sr. Ex. G.) Defendants thus candidly explained the situation to the Independent Trustees who, at Bent II's suggestion, agreed to meet again at 9:30 A.M. that morning. (Bent Sr. Ex. G.)

C.     The 9:30 A.M. Board Meeting

When the Board reconvened at 9:30 A.M., the Board deliberated and then voted to value Lehman at 80% of par. (Bent Sr. Ex. H, p. 8.) During the same meeting, Bent II also reported to the Board that "our custody bank [State Street] is not necessarily sending out wires [in payment of redemption requests] as soon as they get instructions from us." (Bent Sr. Ex. H, p. 3.)

D.     The 1:00 P.M. Board Meeting

RMCI became aware that other money funds which held Lehman paper had publicly announced entering into support agreements. Before considering any disclosures of their own, RMCI sought advice from Willkie – counsel to both RMCI and the Fund. At 12:20 P.M. on

September 15, Crowley sent DiMartino and Goldberg an e-mail, stating, "We want to issue a statement as soon as possible that we will stand behind Primary," and asking, "Does that require that we notify the SEC first or do they just need to pre-approve whatever form that credit support takes?" (Bent II Ex. C.) Based on Willkie's advice (Bent II Ex. N, p. 79), Bent II set up another Board meeting for 1:00 P.M. that day to discuss a support agreement. (Bent II Ex. D.)

Although Goldberg himself had never before been asked for advice about a support agreement (Bent II Ex. E), he nevertheless assumed the Bents understood how support agreements worked and did not explain the mechanics of such agreements to them. (Bent II Ex. E pp. 35-36; see also p. 38.) But the Bents had no experience in providing support to a fund regulated by the SEC and did not know until hours later that they would have to quantify the amount of support they were committing to provide. (Bent II Decl. ¶ 10.)

According to the approved minutes of the 1:00 P.M. Board meeting, Bent II explained that he was proposing a support agreement because redemption requests "had continued unabated throughout the morning," and there "appeared to be a run on the Primary Fund." (Bent Sr. Ex. J, p. 3.) The approved minutes also state that, "[a]s of the beginning of the 1:00 PM call, redemption requests from the Primary Fund were approximately $16.5 billion." (Ibid.) While the Independent Trustees tried to alter this minute entry two years later immediately following a series of SEC interviews, the evidence establishes that the Board was told that redemptions were substantial enough at 1:00 P.M. on September 15 to be causing a "run on the Primary Fund." Indeed, DiMartino testified on February 3, 2009 – less than five months after the meeting took place – that the Board was told, most likely by CFO Farrell, that redemptions had climbed to $14 billion. (Bent II Ex. F, p. 92.)

The minutes further make clear that the Board discussed whether putting a support "arrangement in place could result in a reduction of redemptions." (Bent Sr. Ex. I.) Discovery

has uncovered no evidence that the support agreement was intended to attract new purchasers.  In fact, Bent II has testified that attracting new purchases was not on his mind.  (Bent II Decl. ¶ 9.)  Consistent with this, the 1:00 P.M. minutes make no mention of purchases, but do state:  "Bent II told the Trustees that in order to address what appeared to be a run on the Primary Fund, RMCI would like authorization from the Board to approach the SEC to inquire about putting a credit support agreement in place for the Fund."  (Bent Sr. Ex. I, p. 4; emphasis added.)

The amount of support RMCI would provide was not discussed, nor were the mechanics of how the support agreement would work explained.  (Bent II Ex. F, p. 70.)  Although Strauss asked whether RMCI had enough capital to provide support, and Bent Sr. responded that sufficient capital could be made available (Bent Sr. Ex. I, p. 4), no one questioned Bent Sr. about how much support he thought might be needed.

As of 1:00 P.M., the Fund had approximately $150 million more in assets than was needed for the Fund to maintain a $1.00 NAV without any credit support.  (Bent Sr. Decl. ¶ 23.)  Although he had not been asked to specify the amount, Bent Sr. thought he could raise up to $100 million.  (Bent Sr. Decl. ¶ 21.)  But, like the SEC's then-chairman, he expected the markets to rebound from what he viewed as an overreaction to the Lehman bankruptcy, and did not realize at the time that Lehman's bankruptcy filing had precipitated what Federal Reserve Chairman Bernanke later characterized as "the worst financial crisis in global history, including the Great Depression."  (Bent Sr. Decl. ¶ 21)  There is no better proof that Bent Sr. genuinely held this belief then that he left his own shares in the Fund.  (Bent Sr. Decl. ¶ 53.)

None of the Independent Trustees asked whether Bent Sr. was committing RMCI to provide $785 million in support, nor could they have thought he was doing so.  The Independent Trustees were responsible for annually approving the Fund's Management Agreement with RMCI, which involved reviews of its financials, and thus knew RMCI was a high overhead, low

-7-

margin business which did not generate that level of profits. (Bent Sr. Decl. ¶ 31.)

There is, moreover, evidence that RMCI was understood to be offering to provide support of a different order of magnitude. The draft support agreement that DiMartino prepared three hours later stated that RMCI would provide up to $10 million to support the Fund's NAV – an amount General Counsel Crowley recalled the SEC had proposed – and that RMCI readily could have made available on September 15. (Bent II Decl. ¶ 17.) DiMartino also testified that, since no particular dollar amount was discussed at the Board meeting, she did not believe there was any inconsistency between what Bent Sr. told the Board and the amount she included in her draft. (Bent II Ex. F, p. 67.) Neither she nor any other attorney ever advised RMCI that its contemplated credit support agreement was inadequate. In any event, the $10 million was not a cap, but an initial contribution. DiMartino testified that, had additional support been needed, the amount could simply be increased. (Bent II Ex. F, p. 67.)

E.      Bent II's 1:19 E-mail

While the 1:00 P.M. meeting was in progress, the Board authorized Goldberg and DiMartino to contact the SEC about putting a support agreement in place. (Bent Sr. Ex. I, p. 4.) Goldberg and DiMartino then called Robert Plaze ("Plaze"), the SEC official responsible for support agreements, and explained the Fund's situation. (Bent II Ex. E, p. 41.) Plaze told Goldberg and DiMartino that he would send them a sample support agreement and that, if they provided the right documentation, the SEC would likely grant relief quickly. (Bent II Ex. F, p. 120; Ex. K, p. 132.) DiMartino advised Crowley that RMCI could publicize the fact that it had had preliminary discussions with the SEC about a support agreement, and Goldberg similarly advised Bent II that RMCI could announce its intention to support the Fund. (Bent II Ex. F, pp. 81-82; Ex. E, pp. 28-29.)

At 1:19 P.M., just after the Board Meeting ended, Bent II – based on the SEC's

indications that it would likely grant relief quickly and the advice of his counsel that RMCI could

publicize its discussions with the SEC, sent an e-mail to RMCI's Directors of Sales and

Marketing with a copy to Crowley, stating (Bent II Ex. L):

> We (Reserve Management Company, Inc.) intend to protect the NAV on the
> Primary Fund to whatever degree is required.  We have spoken with the SEC and
> are waiting [for] their final approval which we expect to have in a few hours.
> You may communicate this to clients on an as needed basis.

Within ten minutes after Bent II sent his e-mail, Crowley circulated a clarification which

stated: "We haven't entered into the agreements yet; that's why Bruce's e-mail said we intend

to.  We will submit a form of the agreement to the SEC this afternoon for its review and approval

which we expect to obtain." (Bent II Ex. O.)

The Complaint alleges that Bent II's goal in sending his 1:19 e-mail "was to convince

investors to stop redeeming shares in the Primary Fund by inducing them to rely on the false

representation that RMCI would maintain the $1.00 NAV." (Complt. ¶ 82; emphasis added.)

The SEC will be unable to produce any evidence establishing that the e-mail did not accurately

reflect Bent II's intent as of 1:19 P.M. on September 15, when he still believed that it would be

within RMCI's power to protect the Fund's NAV.  Although the SEC has alleged that Bent II

never really intended to follow through on implementing a support agreement, his conduct was

consistent with his statement of intent:  he immediately put RMCI's lawyers to work preparing

the documents the SEC would need, one of whom had Massaro find a sample no action letter that

DiMartino could use to get started.  (Bent II Ex. P.)

The SEC did not, however, act as quickly.  By 3:02 P.M., when Willkie still had not

received the sample support agreement that Plaze promised, Willkie called Plaze to remind him

that they were still waiting for it.  (Bent II Ex. F, p. 90.)  When Plaze finally forwarded the

sample at 3:16 P.M., he apologized that "[t]hings are coming at me from all directions today."

(Bent II Ex. Q.)  As hard as it was for Plaze to keep up on September 15, Bent II had many

demands on his attention as well. He spent more than nine hours on the phone speaking to the Board, soliciting legal advice from counsel, responding to inquiries, seeking a bank counterparty who would enter into a reverse purchase agreement, and trying to obtain essential information from State Street, the Federal Reserve Banks of both New York and Boston, and investment bankers who had been asked to look for a buyer or strategic partner for RMCI. (Bent II Decl. ¶ 16.)

DiMartino did not complete her first draft of the no action letter until 4:30 P.M., and did not transmit her earliest draft of a support agreement for nearly another three hours (Bent II Ex. R.) She sent it to Crowley – but not to the Bents. (Ibid.) Even though this documentary evidence was already in the SEC's possession when it filed its Complaint, the SEC nevertheless wrongly alleges that RMCI's counsel had "virtually finalized all of the draft documentation necessary to implement a support agreement for the Primary Fund by 4:00 p.m." (Complt. ¶ 98.)

Once Crowley received the draft no action letter, she forwarded it to another in-house RMCI attorney, Scarlet Du ("Du"), and to Massaro – but not to the Bents. After reviewing the draft, Du noted that "the maximum contribution amount by RMCI is $10 million," and asked "[i]s it sufficient?" (Bent II Ex. S.) Crowley's response was that the "[t]he SEC suggested the $10 million so we can go with that for now." (Ibid.)

DiMartino finally sent her first draft of a support agreement to Crowley at 7:16 P.M. (Bent II Ex. T), and she followed up with a revised draft of the no action letter at 7:27 P.M. (Bent II Ex. U.) Crowley did not forward either document to the Bents because she understood that DiMartino was still working on them. (Bent II Ex. K. p. 103.)

By mid-afternoon, Crowley realized that the drafting process was taking longer than expected and grew concerned about whether RMCI could still accurately say that SEC approval was expected within a few hours. She sent Goldberg the following e-mail at 2:49 P.M. asking

-10-

for his advice about "talking points" that RMCI's public relations team was preparing (Bent II

Ex. V):

> While Rose [DiMartino] is busy drafting our SEC letter, can you take a quick look at our talking points below?  They seem okay to me but given the time, I'm not comfortable with the representation that we expect SEC approval "in a few hours" although that was what [Plaze] said in our first call.  Let me know what you think.

The "talking points" that Crowley asked Goldberg to review included statements that

"[t]he Reserve intends to protect the NAV on the Primary fund to whatever degree is required";

that "[t]he Reserve will enter into agreements which will support the value of the Lehman

securities held in our fund"; and that "[t]hese agreements are intended to ensure that any decline

in the value in the Lehman debt will not affect the $1 NAV of the Reserve Primary Fund."  (Bent

II Ex. V.)  Goldberg told Crowley that RMCI could say final approval was expected shortly, and

did not object to anything else in the "talking points," even though they used much of the same

language the SEC now contends was improper.  (Bent II Ex. K, p. 131.)

Once Bent II put the preparation of the documents relating to the support agreement in

the hands of RMCI's attorneys, he assumed they would do what was necessary and focused his

attention on the many other issues facing him.  (Bent II Decl. ¶ 20.)

F.     The Insights Piece

Shortly before 3:00 P.M. on September 15, Eric Lansky ("Lansky"), RMCI's Sales

Director, prepared a statement similar to the "talking points" Crowley had earlier cleared with

Goldberg.  (Bent II Ex. Y.)  Lansky told Bent II that he would first show the statement to

Crowley, and then present it to Bent II.  Lansky assured Bent II that "we are not posting anything

on web nor distributing anything proactively."  (Ibid.)

RMCI's Marketing Director, Frank Bonanno ("Bonnano"), later sent a draft statement to

Bent II who read parts of it to his father and made some changes.  (Bent II Decl. ¶ 33.)  Bent II

did not see the statement again and, although the formal review process was begun, it was never completed. (Bent Sr. Decl. ¶¶ 33-34.) Even so, Bonanno authorized the sales and marketing teams to use the statement, which was entitled *Reserve Insights* ("Insights"), "on your calls and when fielding any redemption requests." (Bent II Ex. Z.) Insights was not a press release and was never picked up on any newswires. (Bent II Decl. ¶ 33.) Had Bent II been able to review the version of Insights that was ultimately circulated, he would not have approved it because it included objectionable language that Crowley had struck.  (Bent II Decl. ¶ 37.)

A few hours later, Lansky sent Bent II an e-mail in which he wrote that he wanted to add "a statement" to the website. (Bent II Ex. BB.) Lansky's e-mail did not attach the proposed statement. At 9:36 P.M., Bent II, who by then had been working for about 40 hours without sleep, responded, "OK, go ahead." (Id.) In doing so, Bent II wrongly assumed that Lansky would prepare a statement which would be put through RMCI's formal review process, as was required for any web posting. (Bent II Decl. ¶¶ 39-40.) Instead, Insights was posted on the website, www.theR.com (the "Website"), on September 16 from 8:15 A.M. until around 11:00 A.M., when it was removed.[2] (Gareis Decl. ¶ 22.) During that less than three-hour window, not a single purchase of Fund shares was made. (Gareis Decl. ¶ 24.)

The posting of Insights on the Website on the morning of September 16 clearly occurred by mistake. By then, Insights was out of date because the Bents had already advised the SEC that a support agreement could not be done. (Bent II Ex. EE.) As it was, Bent II did not know until shortly before 11:00 A.M. on September 16 that Insights had been posted. As soon as he learned of it, he directed it be taken down. (Bent II Decl. ¶ 38.) Although both the SEC and DiMartino were aware that Insights had been posted, and each was in communication with Defendants throughout the day on September 16, neither advised Defendants to post a corrective

_____

[2] The Complaint erroneously asserts that Insights was posted on the Website at 9:36 P.M. on September 15. (Complt. ¶ 112.) No evidence supports this assertion.

disclosure. (Bent II Ex. GG, pp. 259-261.) In fact, when Crowley asked Goldberg whether RMCI could tell the public that a statement providing updated information about the Fund was on its way, Goldberg advised RMCI not to do so. (Bent II Ex. CC.)

G.      State Street Had Not Stopped Funding Redemptions

The Complaint also faults Defendants for failing to disclose to the Board that "[a]t approximately 10:10 a.m. [on September 15], . . .State Street, the Reserve Funds' custodian bank, stopped funding redemption requests placed by shareholders." (Complt. ¶ 61). This allegation is flat out wrong. State Street did not stop funding redemptions then and actually continued sending out wires until 5:28 P.M. that day. (Gareis Decl. ¶ 2.)

For much of September 15, State Street did not tell Defendants that it had made an internal decision to stop funding redemptions. At 9:47 A.M., State Street advised RMCI that, while wires would be delayed because of the "situation going on in the market as a result of Lehman, AIG and Merrill . . . [and the] big demand on money today," the "2:30 timeframe is probably a safe bet" for the funding of all redemption requests. Through 1:00 P.M., State Street generally acted consistently with its promises, funding approximately $11 billion in redemptions by noon. When 3:00 P.M. came without all redemptions being paid, Bent II began trying to get State Street to explain the delays in the wires. To this end, he called State Street over a dozen times from 3:45 P.M. onward, and sent many e-mails. Internal State Street documentation shows that, as late as 6:24 P.M. that day, State Street was still giving RMCI the run-around, and had not responded to Bent II's inquiries. (Gareis Decl. ¶ 17.)

While Defendants did not know it at the time of the 1:00 P.M. Board meeting, State Street made an internal decision at around 1:33 P.M. to put the Reserve on a "debit hold." (Gareis Decl. ¶ 13.) No investors who redeemed after State Street made that decision were able to cash out of the Fund, no matter what Defendants said. Nor was there anything the Board – or

-13-

even the SEC – could have done to force State Street to satisfy redemption requests.  (Bent II Ex. HH.)

H.      Communications With Rating Agencies

The Complaint alleges that, shortly after the 1:00 P.M. Board meeting on September 15, Bent II told Moody's and Standard & Poor's about RMCI's intent to enter into a credit support agreement.  (Complt. ¶ 81.)  The Complaint further alleges that, when pressed for additional details, Bent II promised to provide more information later in the day.  If these statements were made, they were true at the time.  Bent II believed until late on September 15 that RMCI would and could enter into a support agreement that would be sufficient to protect the Fund's NAV, and he did not know that it would take DiMartino until 7:15 P.M. to prepare the first draft of an agreement.  (Bent II Decl. ¶ 23.)  There is no evidence that any of the Defendants supplied the rating agencies with false information.

I.      As Soon As Defendants Realized a Support Agreement Was Not Feasible,
        They Immediately Advised Counsel, Their Regulator, and The Board

By day's end on September 15, redemptions exceeded $20 billion.  The market remained illiquid and had not rebounded, as Bent Sr. had earlier in the day assumed it would.  It became clear to the Bents that, with the unprecedented market collapse that the Lehman bankruptcy caused, the level of support that would actually be required to keep the Fund's NAV at $1.00 far exceeded RMCI's resources, and a support agreement would not be viable.  (Bent II Decl. ¶ 44.) They therefore contacted Goldberg first thing Tuesday morning, told him of their conclusion, and asked him to reach out to the SEC.  (Bent II Decl. ¶ 45.)  Bent II also called Standard & Poor's and Moody's at 7:12 A.M. and 8:19 A.M., respectively, to make sure that they knew RMCI was not going to enter into a support agreement.  (Bent II Decl. ¶ 43.)

At 7:42 A.M. on September 16, following Goldberg's call with the Bents, Goldberg sent Plaze and the then-director of the SEC's Division of Investment Management an e-mail

-14-

disclosing the following information (Bent II Ex. EE):

> Reserve needs an emergency order suspending redemptions. They can't price and
> they don't have enough cash to meet redemptions unless they sell at fire sale
> prices which will wreck [the] NAV. They're going out of business.

By 8:00 A.M., the Bents, along with Goldberg and DiMartino, had the first of several
conversations with the SEC. During that call, Goldberg disclosed the volume of redemptions,
the fact that State Street has stopped funding redemptions, the Fund's inability to raise cash by
liquidating assets, the inability of RMCI to implement a viable support agreement, RMCI's effort
to obtain relief from the Federal Reserve, and the unavailability of other alternatives. (Bent II
Ex. FF, pp. 101-151.) Defendants thus made voluntary and full disclosure to their regulator at
8:00 A.M. on September 16 of all the information that the SEC incorrectly alleges in its
Complaint they had withheld starting at 1:00 P.M. the day before. (Complt. ¶¶ 4, 7.)

J.      The Board's 10:00 A.M. Meeting On September 16

At the Board's next meeting at 10:00 A.M. on September 16, Bent II reported on the
developments since the prior meeting: redemption requests had reached $24.6 billion; State
Street had stopped paying redemptions; RMCI could not provide the enormous amount of
support necessary to maintain the Fund's $1.00 NAV; the SEC had been contacted; and it was
likely the Fund would break the buck without an infusion of cash. (Bent Sr. Ex. J.) The
Complaint does not allege that Defendants made any false representations to, or withheld any
material information from, the Board on September 16 or thereafter.

When all of this information was disclosed to the Independent Trustees at 10:00 A.M. on
September 16, they did nothing with it: they did not set a new value for Lehman; they did not
vote to suspend sales; and they did not, and could not, make it possible for investors who placed
redemption requests to cash out. In short, there is no evidence that the Independent Trustees
would have done anything differently on September 15 even had they been provided with more

-15-

information on Monday afternoon, as opposed to Tuesday morning.

THE COMPLAINT

The Complaint asserts seven claims against Defendants under the Exchange Act, Securities Act, and Advisers Act. Each time Defendants have asked the SEC to elaborate on its claims, the SEC has responded by directing Defendants back to the Complaint: "Plaintiff's detailed Complaint sets forth the basis of its allegations." (SEC's Request for Admission, p. 1.) It should be noted that not a single one of the SEC's claims is based on an allegation that the purchase of Lehman paper, which was fully disclosed and entirely permissible, was wrongful.

The first claim for relief charges Bent II, RMCI, and Resrv with violating § 10(b) of the Exchange Act and Bent Sr. and Bent II with somehow aiding and abetting the other Defendants' primary violations. The second claim charges Bent Sr. and Bent II with liability as control persons under § 20(e) of the Exchange Act. In its third claim for relief, the SEC seeks to hold RMCI, Resrv, and Bent II liable under § 17(a) of the Securities Act. The fourth claim asserts that RMCI, Bent Sr., and Bent II violated §§ 206(1) and 206(2) of the Advisers Act. The fifth claim charges the same three defendants with violating § 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder. The sixth and seventh claims allege that Bent Sr. and Bent II aided and abetted the violations alleged in the fourth and fifth claims. By way of relief, the Complaint seeks a permanent injunction, disgorgement of "the ill-gotten gains [Defendants] received from the violations alleged herein," and civil penalties.

ARGUMENT

SINCE THE SEC CANNOT ESTABLISH ESSENTIAL ELEMENTS OF ITS CLAIMS,
SUMMARY JUDGMENT SHOULD BE ENTERED IN DEFENDANTS' FAVOR

I.    THE APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), "[s]ummary judgment is warranted when the moving party shows that 'there is no genuine dispute as to any material fact' and that it 'is entitled to judgment

-16-

as a matter of law.'" SEC v. Jadidian, 2011 U.S. Dist. LEXIS 36485, * 11 (S.D.N.Y. Mar. 31, 2011).[3] Where, as in this case, "'the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" Ibid.; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (movant entitled to judgment as matter of law where "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof"). Here, since the SEC cannot establish essential elements of its claims in this case, summary judgment should be entered in favor of Defendants.

## II.   THE SEC CANNOT ESTABLISH ALL OF THE ELEMENTS OF ITS SECTION 10(b) and 17(a) CLAIMS

To hold Defendants liable under §§ 10(b) of the Exchange Act and/or 17(a)(1) of the Securities Act, the SEC would have "to prove that in connection with the purchase or sale of a security [each] defendant, acting with scienter, made a material representation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). See SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) ("Essentially the same elements are required under § 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)"); SEC v. Kelly, 2011 U.S. Dist. LEXIS 3290, * 41 (S.D.N.Y. Jan. 7, 2011) ("elements of a claim under Section 17(a)(1) are 'essentially the same' as the elements of a claim under Section 10(b) and Rule 10b-5"). The failure to establish any one of these elements is fatal. SEC v. Rorech, 720 F. Supp. 2d 367, 404 (S.D.N.Y. 2010) (SEC "must prove every element of its claim").

---

[3]     To conserve space, citations are omitted throughout this memorandum.

A.    Statements Intended to Induce Investors Not to Redeem Are Not Actionable Because
They Do Not Satisfy the "In Connection With a Purchase or Sale" Requirement

Summary judgment should be entered dismissing all claims arising from statements

Defendants allegedly made to stop redemptions – and induce investors to hold their shares –

because, as a matter of law, such statements were not made "in connection with" the purchase or

sale of a security, and therefore are not actionable under §§ 10(b) and 17(a). As the Second

Circuit held in Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir. 1977), "the requirement of

fraud in connection with the purchase or sale of a security is not satisfied by an allegation that

plaintiffs were induced fraudulently not to sell their securities."

This principle equally applies to a misrepresentation which induces an investor not to

redeem a security. In SEC v. Northshore Asset Mgmt., 2008 U.S. Dist. LEXIS 36160, * 27

(S.D.N.Y. May 5, 2008), the SEC alleged that one of the defendants convinced an investor "to

redeem 75%, rather than 100%, of its Ardent Domestic investment." The Court granted

summary judgment dismissing the claim because "[t]his is insufficient to demonstrate the 'in

connection with a purchase or sale' requirement." Ibid. See also Gambella v. Guardian Investor

Services Corp., 75 F. Supp. 2d 297, 299 (S.D.N.Y. 1999) (claim that plaintiff " was fraudulently

induced to retain his UENT stock which is now valueless" not actionable under § 10(b));

Bischoff v. G.K. Scott & Co., Inc., 687 F. Supp. 746, 752 (E.D.N.Y. 1986) ("Allegations that

persons were fraudulently induced not to sell their securities do not meet the requirement that the

complained of fraud be in connection with the purchase or sale of securities").

Because statements allegedly made to induce investors not to redeem do not satisfy the

"in connection with a purchase or sale" requirement of §§ 10(b) and 17(a)(1), the SEC's claims

that Defendants violated §§ 10(b) and 17(a)(1) by making statements to induce investors not to

redeem are deficient as a matter of law and must be dismissed.

B.     The "In Connection With" Requirement Cannot Be Satisfied By
       Relying on Purchasers to Whom no Representations Were Made

Although the thrust of the Complaint is that Defendants made misrepresentations to

induce investors not to redeem, the SEC adds a gratuitous allegation that Defendants also sought

to induce purchases.  (Complt. ¶ 4.)  Even if there were some factual basis for this allegation, and

there is not, Defendants would still be entitled to summary judgment to the extent that purchases

were made by investors to whom Defendants made no representations.

To establish fraud "in connection with" the purchase of a security, the SEC must come

forward with evidence that the defendant made a representation to a purchaser.  In this case, with

the exception of a limited number of investors who were in direct contact with RMCI's sales

staff on September 15 – virtually none of whom purchased Fund shares – there is no evidence

that Defendants made representations to investors.  With respect to these purchasers to whom no

representations were made, the "in connection with" requirement cannot be satisfied.

The "in connection with" requirement has been interpreted "to mean 'that the fraud must

have some direct pertinence to a securities transaction.'"  SEC v. Norton, 1997 U.S. Dist. LEXIS

15167, * 15 (S.D.N.Y. Sept. 30, 1997).  See also Crummere v. Smith Barney, Harris Upham &

Co. Inc., 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("To satisfy the purchase and sale requirements

of rule 10b-5, there must be a causal connection between the misstatements or omissions and the

plaintiff's purchases or sales, and there can be no such connection where the misstatement occurs

after the purchase"); SEC v. Adoni, 60 F. Supp. 2d. 401, 409 (D.N.J. 1999) ("the most liberal

readings of § 10(b) have involved at least the opportunity for public reliance").

Between 1:19 P.M. on September 15, when Bent II sent his internal e-mail to RMCI's

Sales and Marketing Directors, and 3:59 P.M. on September 16, when the Fund announced that it

was breaking the buck, there were only 62 non-automated purchases of Fund shares, and only six

of these purchases were made by investors who received an e-mail or other communication

-19-

concerning RMCI's intent to support the Fund. (Gareis Decl. ¶24.) During the same period, Defendants issued no press releases and made no public announcements. Thus, of the 62 purchases between 1:19 P.M. on September 15 and 3:59 P.M. on September 16, 56 clearly cannot satisfy the requirement of fraud "in connection with" the purchase of a security because no representation – false or otherwise – was made to those purchasers. In the less than three-hour window from 8:15 A.M. to 11:00 A.M. on September 16 while Insights was on the Website, no purchases of Fund shares were made. (Gareis Decl. ¶ 24.) .[4]

In sum, other than for six purchasers, the SEC cannot satisfy the in connection with requirement of §§ 10(b) and 17(a), and even as to those six purchasers, the claims fail for the reasons set forth below.

C.    The Alleged Misrepresentations Were Not Material Because,
      No Matter What Defendants Said, Investors Could Not Have Redeemed
      and Because Purchasers Did Not Treat the Statements as Important

To satisfy the materiality requirement of §§ 10(b) and 17(a), "[i]t is not enough that a statement is false or incomplete"; "in order to prevail on a Rule 10(b)-5 claim, a plaintiff must show that the statements were misleading as to a material fact." Basic, Inc. v. Levinson, 485 U.S. 224, 238 (1988) (emphasis in original). Defendants are entitled to summary judgment under §§ 10(b) and 17(a) (1) because, as to would be-redeemers, once State Street stopped funding redemptions, any statements made to induce investors not to redeem were immaterial as a matter of law; and (2) because purchasers did not treat the statements as important.

With respect to the statements supposedly made to induce investors not to redeem – even if they satisfied the "in connection with" requirement – they would not be actionable because they are immaterial. In determining materiality, "the operative question is whether [an investor]

---

[4]    After Insights was removed from the Website, some additional purchases were made. Starting at 10:00 A.M. on September 16 Board, the Independent Trustees took over responsibility for public disclosures. (Bent Sr. Decl. ¶ 39.) Defendants cannot be blamed for purchases made after the Independent Trustees could have suspended sales, but failed to do so.

could have altered its conduct if it had possessed information that was allegedly not disclosed. If [an investor] does not allege how it could have 'acted differently' – either because there was no available remedy or because [investor] used the remedies available to it – an alleged omission is not a material non-disclosure within the meaning of Section 10(b)." TCS Capital Mgmt., LLC v. Apax Partners, L.P., 2008 U.S. Dist. LEXIS 19854, * 47 (S.D.N.Y. Mar. 7, 2008). The test of materiality is not different for the SEC. See Basic, 485 U.S. at 240 n. 18 ("We find no authority . . . for varying the standard of materiality depending on who brings the action").

A long line of cases supports this materiality principle. See, for example, Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 474 n. 14 (1977) (where respondents did "not indicate how they might have acted differently had they had prior notice of the merger," their § 10(b) claim was properly dismissed because "failure to give advance notice was not a material nondisclosure"); Madison Consultants v. FDIC, 710 F.2d 57, 62 (2d Cir. 1983) (information is material where investors can show that, had they known the truth, they "had available some reasonably effective means of protecting themselves against loss"); Nobles v. First Carolina Communications, Inc., 929 F.2d 141, 145 (4th Cir. 1991) ("Nobles had no choice but to sell his limited partnership interest, and thus, any misrepresentation or omission made to him with regard to such transaction could not, as a matter of law, have been material"); United States v. Margala, 662 F.2d 622, 626 (9th 1981) (Santa Fe should be read to support a "commonsense proposition about materiality: A reasonable investor will not view a fact as significant unless he could respond to the fact's disclosure by protecting himself from possible financial loss. There is little reason to require disclosure when an investor could not use the information") (emphasis added); Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 571 (S.D.N.Y. 1971) ("Fact is material in a registration statement whenever a rational connection exists between its disclosure and a viable alternative course of action by an appreciable number of investors").

-21-

In this case, the last redemption request that State Street funded on September 15 was requested at 1:24 P.M. – before Defendants had communicated to any investors about their intention to support the Fund. (Complt. ¶ 77.) Thus, no matter what Defendants told investors after State Street stopped funding new redemption requests, any investors who wanted to redeem would have had no way of protecting themselves against loss because they could not have cashed out their shares. The alleged misrepresentations to would-be redeemers are thus immaterial as a matter of law. Basic, 485 U.S. at 241 ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information").

The SEC has a different problem establishing that material misrepresentations were made to purchasers. There is absolutely no evidence that any of the six purchasers who were informed on September 15 of RMCI's intent to support the Fund regarded it as material; each of the purchases appears to have been a routine, end-of-day trade consistent with the investors' 30-day trading history; and most of the purchasers, consistent with their trading patterns, submitted redemption requests on September 16 – before the Fund announced it broke the buck. (Gareis Decl. ¶ 27.) Nor is there a correlation between the temporary posting of Insights on the Website on September 16 and purchases of Fund shares. On the contrary, between 8:15 and 11:00 A.M. that morning, not a single non-automated purchase was made. Purchasers thus did not appear to attach any significance to Insights. SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1977) ("basically indifferent responses" to information support "conclusion that the information was not material"); SEC v. Texas Gulf Sulphur, Inc., 401 F.2d 833, 851 (2d Cir. 1968) (major factor in determining materiality of statement is significance actually attached to it).

Aside from the 1:19 e-mail (whose substance was transmitted to only a handful of purchasers) and Insights (which there is no evidence that purchasers regarded as important), the only other representations that the SEC alleges were made to investors were statements to the

-22-

rating agencies. Defendants made no untrue statements to the rating agencies. The rating agencies did not, in any case, rely on Defendants' statements. Rather, as the SEC alleges, the rating agencies demanded additional information, "including copies of the actual [support] agreements" (Complt. ¶ 97), which was never provided to them.

D.     Because There Is No Evidence That Defendants' Statements Did Not Accurately Reflect Their Intent At the Time, the SEC Will Be Unable to Prove Scienter

Scienter is a "mental state embracing [an] intent to deceive, manipulate, or defraud." Aaron v. SEC, 446 U.S. 680, 686 n. 5 (1980). "[A] statement of intent need only be true when made; a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b-5 thereunder." In re Phillips Petroleum Secs. Litig., 881 F. 2d 1236, 1245 (3d Cir. 1989). Accord Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999) (summary judgment granted where there was no evidence that person who made statement of intention "did not intend to do just what he promised to do at the times he made the statements").

The SEC will be unable to produce evidence establishing that, when Bent II said that RMCI intended to support the Fund, he did not mean it. On the contrary, the evidence shows that, on the afternoon of September 15, Bent II expected to be able to implement an adequate support agreement, and his intent changed when it became clear the support agreement, which had earlier seemed workable, was no longer feasible because the amount of support the Fund would need exceeded RMCI's capabilities. See Pommer v. Medtest Corp., 961 F.2d 620, 623 (7th Cir. 1992) ("securities laws approach matters from an *ex ante* perspective: . . . a statement true when made does not become fraudulent because things unexpectedly go wrong"); Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1332 (7th Cir. 1995) (§10(b) "implicitly precludes basing liability on circumstances that arise after the speaker makes the statement'").

With the benefit of hindsight, it may appear that Bent II should not have expected the plan for RMCI to support the Fund to be workable. But securities fraud cannot be based on a

-23-

failure to predict the future, particularly a once-in-a-lifetime financial crisis. It is what Bent II intended at 1:19 P.M. on September 15 – and not what happened later – that is relevant to the issue of scienter. Since the SEC will be unable to come forward with evidence that Bent II's statement of intent was not true when made, it cannot establish scienter.

E.    There Can Be No Aider and Abettor Liability

Under § 20(e) of the Exchange Act, no Defendant can be held liable as an aider and abettor of a § 10(b) violation unless the SEC first establishes that a primary wrongdoer has committed a § 10(b) violation. SEC v. PIMCO Advisors Fund Mgmt., LLC, 341 F. Supp. 2d 454, 467-468 (S.D.N.Y. 2004). Here, as set forth in Point II(A)-(D) above, the SEC cannot establish a primary violation, and it therefore cannot establish aider and abettor liability either.

F.    There Can Be No "Control Person" Liability

Similarly, the SEC cannot establish "control person" liability under § 20(a) of the Exchange Act because, among other things, it cannot establish a primary violation for RMCI's alleged violation of § 10(b). See ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (requiring "primary violation by the controlled person").

III.    THE SEC CANNOT PREVAIL ON ITS CLAIMS UNDER THE ADVISERS ACT

A.    Since The Bents Were Not Themselves Investment Advisers,
They Cannot Be Liable for Violating the Advisers Act

The SEC's fourth and fifth claims seek to hold RMCI, Bent Sr., and Bent II liable for violations of Sections 206(1), (2), and (4), of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder. Each of these sub-sections is introduced by language which provides that "[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce," followed by a description of the type of conduct it prohibits. Thus, § 206 is, by its terms, only applicable to "investment advisers." While RMCI was an investment adviser, neither of the Bents was himself an investment adviser. Accordingly,

-24-

they cannot be liable under the Advisers Act, and summary judgment should be granted dismissing the Advisers Act claims as a matter of law.

The Advisers Act defines " investment adviser" to mean "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(11).

The Advisers Act separately defines "person associated with an investment adviser" as "any partner, officer, or director of such investment adviser (or any person performing similar functions), or any person directly or indirectly controlling or controlled by such investment adviser, including any employee of such investment adviser. . . ." It thus clearly differentiates between an " investment adviser" and a "person associated with an investment adviser."

As officers of RMCI, the Bents were "persons associated with an investment adviser," but were not "investment advisers": although they received salaries as RMCI officers, they did not themselves receive compensation tied to advising others as to the value of securities or the advisability of investing in securities, nor did they personally receive compensation for issuing reports concerning securities. Since §§ 206(1), (2), and (4) prohibit conduct by "investment advisers" and do not purport to regulate "persons associated with investment advisers," Bent Sr. and Bent II cannot be liable for violating these Sections.

Other sections of the Adviser Act apply generally to "any person" and are not limited to "investment advisers." This shows that, when Congress intended to make a prohibition applicable to "any person," rather than just to "investment advisers," it knew how to do so. See, e.g., 15 U.S.C. § 80b-7 ("It shall be unlawful for any person willingly to make any untrue statement of material fact in any registration application. . . .").

-25-

In keeping with the plain language of § 206, the SEC has not been allowed to bring claims for violating § 206 against persons who are not investment advisers.  For example, in PIMCO, supra, 341 F. Supp. 2d 454, when the SEC asserted claims under § 206 against two individuals, one of whom was the CEO of an investment adviser, the court dismissed the claim, explaining:  "The SEC may not charge Treadway and Corba with violations of §§ 206(1) or 206(2), directly, since they are not themselves investment advisers covered by the statutory provisions."  Id., 341 F. Supp. 2d at 470.  Greenspan v. Del Toro, 1974 U.S. Dist. LEXIS 8475, * 5 (S.D. Fla. May 17, 1974) ("Since §80b-6 applies only to 'investment advisers,' only such persons shall be amenable to suit").

B.    The Evidence Does Not Support an Advisers Act Claim Against RMCI

Once the claims against the Bents are disposed of, this leaves the SEC with claims that RMCI violated §§ 206(1), (2), and (4) of the Advisers Act.  Sections 206(1) and (2) make it unlawful "to defraud any client or prospective client" or to engage in conduct "which operates as a fraud or deceit upon any client or prospective client," respectively.  For purposes of § 206, the "client" of a money market fund's investment adviser is the fund – and not its investors.  As the court explained in Goldstein v. SEC, 451 F.3d 873, 879-880 (D.C. Cir. 2006):

> An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice *directly*.  He invests a portion of his assets in the fund.  The fund manager – the adviser – controls the disposition of the pool of capital in the fund.  The adviser does not tell the *investor* how to spend his money; the investor made that decision when he invested in the fund. Having bought into the fund, the investor fades into the background. . . .  If the person or entity controlling the fund is not an "investment adviser" to each individual investor, then *a fortiori* each investor cannot be a "client" of that person or entity.  These are just two sides of the same coin.

Although it is not clear from the Complaint, the SEC's claims under §§ 206(1) and (2) must necessarily be based on allegations that the Independent Trustees – who were, in effect, RMCI's client – were defrauded.  The SEC will be unable to prove such allegations.

-26-

In PIMCO, supra, 341 F. Supp. 2d at 470, the Court pointed out that "[t]he provisions of §§ 206(1) and 206 (2) have been interpreted as substantively indistinguishable from § 17(a) of the Securities Act, except that § 206(1) requires proof of fraudulent intent, while § 206(2) simply requires proof of negligence by the primary wrongdoer." To establish a claim under § 17(a)(1), the SEC must present evidence of, among other things, a material misrepresentation or omission that was made with scienter. SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). For many of the same reasons that the SEC cannot establish the elements of its § 17(a) claim, it also cannot establish the elements of its § 206(1) claim.

With respect to the matters about which the Independent Trustees were supposedly misled – RMCI's ability to support the Fund, whether State Street was funding redemptions, and redemption levels – the SEC will be unable to prove scienter and a material misrepresentation. First, there is no evidence that RMCI's ability to support the Fund was misrepresented at the 1:00 P.M. Board Meeting on September 15. (Bent Sr. Decl. ¶¶ 20-26.) Second, there is irrefutable evidence that, as of 1:00 P.M. on September 15, State Street had not decided yet to stop funding redemptions. (Gareis Decl. ¶¶ 4-5.) Third, the Board was told at the 1:00 P.M. meeting that "redemption requests from shareholders in the Primary Fund had continued unabated throughout the morning," when they had already reached $5.2 billion. (Bent Sr. Ex. J.) Based on these undisputed facts, the SEC will not be able to show a misstatement to the Board.

While the absence of a misrepresentation is fatal to the SEC's § 206(1) claim, that is not its only deficiency. The SEC also cannot show that, if there were a misrepresentation, it would have been material. Once the Independent Trustees had all the information on September 16 that they supposedly lacked on September 15, nothing changed. After the Board was told at 10:00 A.M. on September 16 that the Fund would likely break the buck, the Independent Trustees did not re-value the Fund's Lehman paper or suspend purchases. And, once State Street stopped

-27-

funding redemptions, there was nothing the Independent Trustees (or even the SEC) could have done to force State Street to make payments. (Bent II Ex. HH, pp. 33-34.) For this reason, because the Independent Trustees did not and could not do anything to protect investors who wanted to redeem, the information supposedly misrepresented was not material.

With respect its § 206(2) claim, "the SEC must prove by a preponderance of the evidence that: (1) Defendants are investment advisers; (2) Defendants used the mails or any other means or instrumentality of interstate commerce, directly or indirectly (3) to make a misstatement or omission of material fact to a client or prospective client; and (4) Defendants acted negligently." SEC v. Bolla, 401 F. Supp. 2d 43, 67 (D.D.C. 2005), aff'd in relevant part, 475 F.3d 392 (D.C. Cir. 2007).

In this case, RMCI has been left to guess what the SEC's § 206(2) claim is based on. The Complaint refers only to "fraudulent conduct" (Complt. p. 9), and does not allege that RMCI was negligent in any respect. To date, the sole negligent act that the SEC has so much as alluded to is RMCI's alleged failure to monitor the price of Lehman paper on September 15 and 16. Even if that claim had actually been pled in the Complaint, it would have been baseless. As the Bent Sr. declaration establishes, RMCI did monitor Lehman trades. (Bent Sr. Decl. ¶ 15)

Moreover, even though a § 206(2) claim does not require scienter, it still requires a material misstatement or omission. Bolla, 401 F. Supp. 2d at 67. The materiality requirement cannot be satisfied here because, for the reasons set forth above, the Independent Trustees could not have done —and did not, in fact, do — anything else to keep the Fund from breaking the buck once State Street stopped funding redemptions. Defendants also cannot be faulted for failing to tell the Board what State Street was doing until they themselves had a clear understanding. See, for example, Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are

-28-

entitled to investigate for a reasonable time, until they have a full story to reveal")

According to the SEC, its claim under § 206(4), and Rule 206(4)-8 thereunder, also does not require a showing of scienter. (ECF Doc. No. 126, p. 27.) However, Rule 206(4)-8 <u>does</u> require that any misstated or omitted fact be "material." <u>See</u> Rule 206(4)-8(a)(1). Thus, for the same reason that the SEC cannot establish the materiality element of its §§ 10(b) and 17(a) claims, it cannot establish materiality for its § 206(4) claim.

IV.   THE SEC CANNOT PRODUCE EVIDENCE ESTABLISHING THAT
THE BENTS AIDED AND ABETTED VIOLATIONS OF SECTION 206
AND, EVEN IF IT COULD, CIVIL PENALTIES CANNOT BE IMPOSED

A.   The SEC Cannot Adduce Evidence Which Supports
An Aiding and Abetting Claim Under the Advisers Act

To sustain its sixth and seventh claims, which seek to hold the Bents liable for aiding and abetting violations of §§ 206(1), (2), and (4), the SEC would have to show: "(1) an underlying violation of the act; (2) Defendant's knowledge of the fraudulent acts; and (3) Defendant's provision of substantial assistance to the primary violation." <u>SEC</u> v. <u>Gabelli</u>, 2010 U.S. Dist. LEXIS 27613, *22 (S.D.N.Y. Mar. 17, 2010). <u>Accord</u> <u>SEC</u> v. <u>Steadman</u>, 967 F.2d 636, 647 (D.C. Cir. 1992). The SEC cannot make that showing for either Bent.

In <u>Steadman</u>, <u>supra</u>, the Court reversed a finding that the defendant was liable for aiding and abetting a violation of the Advisers Act based on his "ultimate supervisory responsibility" over the primary wrongdoer (967 F.2d at 647):

> However important that admission may be to a finding of liability based on *respondeat superior*, it is completely beside the point when the question is aiding and abetting. The SEC has not pointed to a single piece of evidence that tends to show that Mr. Steadman was generally aware that the Corporation's subscription and redemption accounts were being managed improperly or that surprise audits were required. Mr. Steadman, therefore, may not be held liable for aiding and abetting those violations.

The evidence is just as lacking in this case. There was no primary violation here; the

-29-

Bents did not know of any fraud; and no evidence exists showing that they provided substantial assistance, which requires more than approval and acquiescence in someone else's misconduct. SEC v. Tecumseh, 2009 U.S. Dist. LEXIS 119869, * 17 (S.D.N.Y. Dec. 22, 2009) ("it is well-established in the Second Circuit that 'mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance.'").

B.    There is No Legal Authority for Imposing Civil Penalties on
      A Defendant for Aiding and Abetting a Violation of the Advisers Act

Even if the SEC's aiding and abetting claim were not factually baseless, the civil penalties the SEC seeks against Bent Sr. and Bent II for purportedly aiding and abetting violations of § 206 are not recoverable as a matter of law. The Complaint cites § 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), as authorizing the Court to order the Bents to pay civil monetary penalties for allegedly aiding and abetting a violation of § 206. (Complt. p. 43(V).) But § 209(e)(1) does not empower courts to impose a penalty on anyone other than the primary violator. It provides that "the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." (Emphasis added.)

This language has been held to bar the SEC from seeking to impose civil monetary penalties on aiders and abettors under the Advisers Act. As the court held in Gabelli, 2010 U.S. Dist. LEXIS 27613, * 30, "the statutory language is unambiguous that civil penalties in judicial proceedings may be imposed only upon a 'person who committed' a violation of the Investment Advisers Act"). Accord SEC v. Bolla, 550 F. Supp. 2d 54 (D.D.C. 2008) ("Section 209(e) of the Advisers Act does not authorize the SEC to seek, or grant this Court jurisdiction to impose, monetary penalties upon Defendant for his aiding and abetting violations of the Act"). Accordingly, the SEC's request that civil monetary penalties be imposed on the Bents for aiding and abetting violations of § 206 has no legal basis and should be dismissed.

V.      DISGORGEMENT IS UNAVAILABLE AS A REMEDY BECAUSE THE
        SEC HAS NO EVIDENCE OF ANY "ILL-GOTTEN GAINS"

Other relief that the SEC seeks is also unavailable in this case.  For example, the fourth

item in the SEC's prayer for relief is an order requiring "each of the Defendants to disgorge the

ill-gotten gains they received from the violations alleged herein. . . ." (Complt. p. 43(IV).)

Disgorgement is intended to prevent unjust enrichment and "is appropriate only in situations in

which a defendant has benefitted from ill-gotten gains and should not be used as punishment."

SEC v. Norton, 21 F. Supp. 2d 361, 365 (S.D.N.Y. 1998).

In discovery, Defendants have repeatedly sought to find out from the SEC what it claims

are "ill-gotten gains."  In response, the SEC has provided nothing except tautological statements

such as "it seeks disgorgement of all ill-gotten gains derived by Defendants from their conduct as

alleged in the Complaint" (SEC's Response to Interrog. No. 1) or generic statements such as that

it seeks "disgorgement of all ill-gotten gains, . . . including but not limited to, all fees, bonuses,

or other payments earned or claimed under any agreements or otherwise pertaining to assets

under management after September 16, 2008, and any agreements made pursuant to

indemnification agreements relating to Defendants' litigation expenses incurred in their

respective defenses of this action" (SEC's Suppl. Disclosure Statement, p. 2 ¶ C).  This laundry

list of amounts that may be paid to Defendants is no substitute for evidence.  The reason for this

failure of proof is simple:  Defendants received no ill-gotten gains in this case.  (Boruch Decl.)

Where, as here, the SEC seeks disgorgement, but can produce no evidence that would

enable the Court to determine what part of the defendants' gains, if any, is causally connected to

the alleged wrongdoing, summary judgment dismissing the disgorgement claim is proper.  SEC

v. Kelly, 2011 U.S. Dist. LEXIS 3290 (S.D.N.Y. Jan. 7, 2011) (summary judgment dismissing

disgorgement claim); SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007); Norton, 21 F. Supp.

2d at 366 (same).  The same result is appropriate here.

In Kelly, supra, when the SEC was asked in discovery to identify the nature and amount of profit it sought to disgorge based on defendants' alleged involvement in a scheme to inflate stock prices, it gave responses that were almost as generic and unenlightening as the responses it gave in this case: it cited the yearly compensation and bonus amounts of one of the defendants. The Court pointed out (2011 U.S. Dist. LEXIS 3290, * 60):

> There is no evidence that Rindner's entire compensation from 2000 through 2003 was tied to AOL's recognition of advertising revenue on the round- trip transactions, and there is no evidence in the record that would allow this Court to determine what percentage of his compensation should be disgorged.

The Court also noted that, "because the disgorgement remedy is remedial, rather than punitive, a court cannot order disgorgement of an amount above that which was wrongfully acquired." Id., * 58. Since the SEC had "proffered no evidence this Court could use to reasonably approximate the percentage of [defendants'] compensation that was causally connected to the alleged violations," Id., * 59-60, it granted summary judgment to defendants on the disgorgement claim – even though it declined to dismiss the securities fraud claims.

The SEC's disgorgement claim was dismissed for essentially the same reason in Jones, supra – because the SEC was "unable to set forth any evidence of specific profits subject to disgorgement" or even "provide the Court with any guideposts for determining the amount of Defendants' compensation subject to disgorgement." Id, 476 F. Supp. 2d at 386.

Since the SEC cannot sustain its "initial burden of persuasion that the amount of disgorgement it seeks approximates the amount by which the defendant was unjustly enriched," SEC v. Johnson, 2006 U.S. Dist. LEXIS 50307, ** 22-23 (S.D.N.Y. July 21, 2006), it cannot obtain disgorgement.

## VI. THE SEC CANNOT RECOVER MORE THAN THE FIXED PENALTIES BECAUSE DEFENDANTS HAD NO PECUNIARY GAIN

In the event that the SEC's claims are not dismissed in their entirety, its request for civil

penalties should be limited to the fixed amounts set forth in the applicable penalty statutes, which authorize the Court to impose penalties in the greater of (1) that fixed amount or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d); 15 U.S.C. § 80b-9(e). As we explained in Point V above, the SEC can show no pecuniary gain to the Defendants from any alleged violation.

VII.    INJUNCTIVE RELIEF IS NOT WARRANTED GIVEN THE INDISPUTABLY ISOLATED NATURE OF DEFENDANTS' ALLEGED WRONGDOING

Even if the SEC were to prevail on any or all of its claims, it would not be entitled to a permanent injunction against Defendants. In recognition of the serious consequences of granting injunctive relief, the Second Circuit has emphasized that the SEC must "go beyond the mere fact of past violations and demonstrate a realistic likelihood of recurrence." SEC v. Commonwealth Secs., Inc., 574 F.2d 89, 100 (2d Cir. 1978). "It is well settled that the Commission cannot obtain [injunctive] relief without positive proof of a reasonable likelihood that past wrongdoing will recur." Bausch & Lomb., 565 F.2d at 18. No such positive proof exists here.

Where the alleged misconduct occurred on an isolated occasion and was of limited duration, the SEC cannot sustain its burden of showing a likelihood of recurrence. Jadidian, 2011 U.S. Dist. LEXIS 36485, * 16 ("Given that the SEC has not offered proof of other violations committed by Jadidian, this Court must conclude that the TTCN episode – which took place over approximately one month – was an 'isolated occurrence,'" and injunction denied on summary judgment); Gabelli, 2010 U.S. Dist. LEXIS 27613, * 26-27 (SEC did not plausibly allege reasonable likelihood defendants would engage in future violations where there was no allegation of "other fraudulent activity either prior or subsequent to the specific claims brought here"); Jones, 476 F. Supp. 2d at 384-385 (where SEC "has adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent violation,'" court concluded that, "[w]hen viewed together with the severity of potential

-33-

collateral consequences for Defendants should a permanent injunction issue. . . , the [SEC's] requested relief can only be characterized as a penalty").

Another factor which has been held to militate against the issuance of an injunction is a defendant's reliance on advice of counsel and its conduct after the alleged violation was brought to its attention. Steadman, 967 F.2d at 648 (holding that "[g]ood faith reliance on the advice of counsel is also a factor in determining the propriety of injunctive relief").

The SEC cannot sustain its burden of presenting evidence establishing a realistic likelihood of recurrence here. Indeed, RMCI is not a registered investment adviser anymore, nor is Resrv still a registered broker-dealer. The purported misconduct was confined to a 19-hour period when Defendants were grappling with a once-in-a-lifetime worldwide catastrophe. See Bausch & Lomb., 565 F.2d at 18 (rejecting injunction where defendant, "in an agitated moment, temporarily abandoned his usual caution and allowed inside material information to 'pop out'"). Defendants made no attempt to hide what had happened: they surrounded themselves with experts from whom they sought legal advice and even reached out to the SEC on September 15 and 16, 2008.

No less importantly, the SEC did not thereafter raise any objection to the Independent Trustees' decision to continue using Defendants to administer the highly complex liquidation and distributions of the Fund's remaining $50+ billion of assets. Rather, it reaped the benefits of Defendants' services and then reneged on its promise to reimburse them for the same.

Under the circumstances, a permanent injunction would stigmatize Defendants but serve no beneficial purpose. The SEC's application for one is baseless and should be dismissed.

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted to Defendants dismissing the Complaint in all respects.

-34-

Dated: New York, New York
      May 13, 2011

                    Respectfully submitted,

                    DUANE MORRIS LLP

                    By:_____ /s/ Fran M. Jacobs_____
                              Fran M. Jacobs
                              John Dellaportas
                              Kathrine A. Gehring
                    1540 Broadway
                    New York, NY  10036
                    (212) 692-1000
                    Attorneys for Defendants
                      Reserve Management Company, Inc. Resrv
                    Partners, Inc., Bruce R. Bent, Sr. and Bruce
                    R. Bent II

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SECURITIES AND EXCHANGE                           :
COMMISSION,                                       :
                                                  :
                          Plaintiff,              :
                                                  :
            v.                                    :    No. 09 Civ. 4346 (PGG)
                                                  :
RESERVE MANAGEMENT COMPANY, INC.,                 :    ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR.              :
and BRUCE BENT II,                                :
                                                  :
                          Defendants,             :
      and                                         :
                                                  :
THE RESERVE PRIMARY FUND,                         :
                                                  :
                          Relief Defendant.       :
-------------------------------------------------------------------X

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN OPPOSITION TO
THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF
DEFENDANTS BRUCE BENT SR., BRUCE BENT II, RESERVE MANAGEMENT
COMPANY, INC. AND RESRV PARTNERS, INC.

SECURITIES AND EXCHANGE COMMISSION
Nancy A. Brown
Valerie A. Szczepanik
Michael D. Birnbaum
Michael P. Holland
3 World Financial Center
New York, New York  10281
(212) 336-1023 (Brown)

June 13, 2011

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .............................................................................1

ARGUMENT...........................................................................................................3

I.  THE COMMISSION HAS SUFFICIENT EVIDENCE OF
    EACH OF THE ELEMENTS OF ITS EXCHANGE ACT
    AND SECURITIES ACT CLAIMS ................................................................3

    A.  Because Investors Purchased Shares After Defendants Issued Their
        False Statements and Because Defendants Induced Redeemers to
        Buy Back into the Fund with Those Same Statements, the Commission
        Has Established the Elements of its Claims.............................................3

        1.  Any Purchase Made After Defendants Published Their False and
            Misleading Statements of Intent Satisfies the "In Connection With"
            Requirement Even if No Investor Relied on Them ..........................4

        2.  Defendants Ignore that the Securities Act and Advisers Act Contain
            No "In Connection With" Element at All.........................................7

    B.  Investors Had Alternatives Available to Them, Establishing Materiality
        Even Under Defendants' Erroneous Test ................................................8

    C.  Defendants Admit that Their Statements Omitted the Many Material
        Conditions to and Limitations on their Intent to Support the Fund.......10

    D.  Defendants Are Aiders and Abettors of the Entity Defendants' Exchange
        Act and Advisers Act Violations Because They Knew of the
        Violations and Either Actively Promoted Them or Directed Them. ......13

    E.  Defendants Are Liable as Control Persons.............................................15

II.  ABUNDANT EVIDENCE OF DEFENDANTS' FAILURE TO
     PROVIDE THE BOARD AND INVESTORS WITH ALL
     MATERIAL FACTS SUPPORTS THE COMMISSION'S
     ADVISERS ACT CLAIMS............................................................................17

    A.  RMCI, Bent Sr., and Bent II Violated the Investment Advisers Act
        by Keeping Material Facts from the Board and Public ..........................18

    B.  Bent Sr. and Bent II Were Investment Advisers.....................................21

        1.  Bent Sr. and Bent II Provided Investment Advice to the Primary Fund..........21

2. Bent Sr. and Bent II Received Compensation for Their Investment
Advisory Services to the Primary Fund .................................................24

III. DEFENDANTS' OWN CALCULATIONS OF THEIR PROFITS
PROVIDE THE MEASURE OF THEIR ILL-GOTTEN GAINS
AND THE COURT HAS THE DISCRETION TO AWARD
PENALTIES BASED ON THAT CALCULATION OR A PER
VIOLATION CALCULATION .................................................................25

IV. DEFENDANTS' HISTORY OF SECURITIES LAW
VIOLATIONS MAKES FUTURE VIOLATIONS LIKELY
AND THEY ARE DESERVING OF AN INJUNCTION .................................28

CONCLUSION ................................................................................................30

## TABLE OF AUTHORITIES

**Page**

**Cases**

Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977)................................7, 21

Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972)................................5

Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372 (S.D.N.Y. 2010)................ 16-17

Arista Records LLC v. Lime Group LLC, 06 CV 5936 (KMW),
2011 WL 1642434 (S.D.N.Y. April 20, 2011) ................................11

Basic, Inc. v. Levinson, 485 U.S. 224 (1988)................................8

Berko v. SEC, 316 F.2d 137 (2d Cir. 1963) ................................5

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................2, 18

Dietrick v. Bauer, 126 F. Supp. 2d 759 (S.D.N.Y. 2001)................................16

Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618 (S.D.N.Y. 2004)................17

Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006) ................................20

Hemming v. Alfin Fragrances, Inc., 690 F. Supp. 239 (S.D.N.Y. 1988) ................16

In re Alstom SA Secs. Litig., 406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................16

In re Parmalat Sec. Litig., 594 F. Supp. 2d 444 (S.D.N.Y. 2009) ................................16

In re Tronox, Inc. Sec. Litig., No. 09 Civ. 6220 (SAS),
2011 WL 43508 (S.D.N.Y. Jan. 5, 2011) ................................17

Litwin v. Blackstone Group, L.P., 634 F.3d 706 (2d Cir. 2011)................................8

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
652 F. Supp. 2d 495 (S.D.N.Y. 2009).................................2

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)................................3

Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.,
459 F. Supp. 597 (S.D.N.Y. 1978) ................................29

Romano v. Kazacos, 609 F.3d 512 (2d Cir. 2010) ................................3

**Page**

SEC v. Berger, 244 F. Supp. 2d 180 (S.D.N.Y. 2001),
aff'd, 322 F.3d 187 (2d Cir. 2003)..................................................................22

SEC v. Blatt, 583 F.2d 1325 (5th Cir. 1978) .................................................30

SEC v. Calvo, 378 F.3d 1211 (11th Cir. 2004)..............................................28

SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009)......................................2, 14, 15

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996).................15, 28

SEC v. First Pacific Bancorp., 142 F.3d 1186 (9th Cir. 1998)......................26

SEC v. Gunn, 3:08-CV-1013-G,
2010 WL 3359465 (N.D. Tex. Aug. 25, 2010)..............................................30

SEC v. Haligiannis, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)..........................27

SEC v. Invest Better 2001, No. 01 Civ. 11427 (BSJ),
2005 WL 2385452 (S.D.N.Y. May 4, 2005) .................................................27

SEC v. Jadidian, No. 08 Civ. 8079 (PGG),
2011 WL 1327245 (S.D.N.Y. Mar. 31, 2011) ...............................................28

SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ...................................25

SEC v. Kelly, No. 08 Civ. 4612 (CM),
2011 WL 135845 (S.D.N.Y. Jan. 7, 2011) .................................................5, 25

SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998)......................28

SEC v. Mannion, No. 10-cv-3374-WSD, --- F. Supp. 2d ---,
2011 WL 2270856 (N.D. Ga. June 2, 2011)................................................5, 20

SEC v. Nacchio, 438 F. Supp. 2d 1266 (D. Colo. 2006)................................20

SEC v. PIMCO Advisors Fund Mgmt., LLC, 341 F. Supp. 2d 454
(S.D.N.Y. 2004)..........................................................................................21-22

SEC v. Pirate Inv. LLC, 580 F.3d 233 (4th Cir. 2009)....................................5

SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) ...................................................26

**Page**

SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL),
2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)..............................20

SEC v. Steadman, 967 F.2d 636 (D.C. Cir. 1992).............................14, 20

SEC v. Tambone, 550 F.3d 106 (1st Cir. 2008),
rev'd en banc on other grounds, 587 F.3d 436 (2010).............................20

SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490 (SAS),
2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) .............................28

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968)..............................3

SEC v. Young, Civil Action No. 09-1634,
2011 WL 1376045 (E.D. Pa. April 12, 2011).............................22-23, 24

SEC v. Zandford, 535 U.S. 813 (2002).............................3

United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991) .............................11

United States v. Elliot, 62 F.3d 1304 (11th Cir. 1995) .............................24

United States v. Naftalin, 441 U.S. 768 (1979) .............................7

United States v. Ogale, 378 F. App'x 959 (11th Cir. 2010) .............................21

United States v. Quinones, No. 09-4361-cr,
2011 WL 1150864 (2d Cir. Mar. 29, 2011).............................12-13

**Statutes and Regulations**

Securities Act of 1933

    Section 2(a)(3), 15 U.S.C. § 77b(a)(3).............................7

    Section 17(a), 15 U.S.C. § 77q(a).............................2, 3, 7, 29

Securities Exchange Act of 1934

    Rule 12b-2, 17 C.F.R. § 240.12b-2.............................15

    Section 10(b), 15 U.S.C. § 78j(b) .............................1, 3, 4, 13, 29

    Rule 10b-5, 17 C.F.R. § 240.10b-5.............................13, 29

v

**Page**

Investment Advisers Act of 1940

    Section 202(11), 15 U.S.C. § 80b-2(11) ...................................................21, 24

    Section 206(1), 15 U.S.C. § 80b-6(1) ..................................................13, 17, 21

    Section 206(2), 15 U.S.C. § 80b-6(2) ...........................................13, 17, 20, 21

    Section 206(4), 15 U.S.C. § 80b-6(4) ...........................................13, 17, 20, 21

        Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 .............................13, 17, 20, 21

    Section 209(e), 15 U.S.C. 80b-9(e).................................................................15

Investment Company Act of 1940

    Section 10(a), 15 U.S.C. § 80a-10(a)..............................................................29

    Section 34(b), 15 U.S.C. § 80a-33(b) .............................................................29

**Rules**

    Fed. R. Civ. P. 30(b)(6)...................................................................................6

**Miscellaneous**

In re Reserve Mgmt. Corp., Reserve Mgmt. Co., Henry B.R. Brown
and Bruce R. Bent, Rel. Nos. IC-11394, IA-733,
1980 WL 20755 (Oct. 10, 1980)........................................................................29

Investment Advisers Act Rel. No. IA-1092, 1987 WL 112702 (Oct. 9, 1987).................24

E.C. Lashbrooke, Jr., The Alternative –Action Requirement:
The Derailment of Santa Fe, 1981 Duke L. J. 963 (1981)........................................8

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in opposition to the Motion for Summary Judgment of Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Resrv Partners"), Bruce Bent Sr. ("Bent Sr.") and Bruce Bent II ("Bent II").

## Preliminary Statement

Defendants are not entitled to summary judgment on any of the Commission's claims. The Commission has offered a wealth of evidence to support each of its Securities Act, Exchange Act and Advisers Act claims – such substantial evidence, in fact, that it is the Commission's Motion for Summary Judgment on those claims that should be granted.

Defendants' chief tactic on this motion is to ignore critical evidence and then claim that none exists. For example, Defendants' primary argument on the Commission's Section 10(b) claim is that the Commission cannot establish that there were any purchases made "in connection with" Defendants' false pledge to support the Fund. But, rather than proving that point, Defendants are forced to admit that there were in fact purchases made after they broadly disseminated Defendants' message of commitment to support the Fund.

Defendants try the same thing to defeat the Commission's Advisers Act claims, arguing that there is no evidence that either Bent was an investment adviser under the Act. That argument requires them to ignore the substantial evidence of both Bents' active management of the Fund's investments both before September 15 and 16 and during those critical days, but it also requires them to ignore the Declaration of Bent Sr. they submit in support of their motion. In his Declaration, Bent Sr. attests to his "personal" review of the very investment in Lehman that brought them to this point.

1

Defendants even try to ignore evidence of their long history of securities laws violations in arguing that injunctive relief is improper because their misconduct on September 15 and 16 was, they say, a single, isolated infraction. Defendants' record speaks for itself. What happened on September 15 and 16 was not an isolated, uncharacteristic lapse of long-standing compliance; it was just another – much more serious – instance of Defendants' disregard for their obligations to abide by the securities laws.

And when ignoring bad facts fails them, Defendants turn to ignoring controlling law. So, for example, in arguing that the "in connection with" element defeats the Commission's Exchange Act and Securities Act claims, Defendants disregard the statutory language of Section 17(a) that requires no purchase of a security at all. In arguing that no penalties can be awarded on Advisers Act aiding and abetting claims, Defendants ignore the Second Circuit's unequivocal holding to the contrary in SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009).

On this motion against the party with the burden of proof, Defendants' job here is to demonstrate that there is insufficient evidence to support essential elements of the Commission's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). But ignoring evidence in the record (or controlling authority) will not work to win Defendants summary judgment. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 652 F. Supp. 2d 495, 503 (S.D.N.Y. 2009) (defendants' failure to acknowledge record evidence precludes summary judgment argument that none exists).

Thus, this is not the typical summary judgment motion where the moving party cites testimony or documentary evidence and the opponent cites conflicting testimony or evidence, creating an issue of fact. To the extent that the Commission disputes any of Defendants' 56.1 statements of facts, it is largely to point out the testimony from disinterested witnesses that

2

makes those statements false, not disputed. Defendants are left with no "evidence supporting [their motion] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses," and, for that reason, summary judgment should be denied. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (noting that the same standard applies to Rule 56 motions as to Rule 50 motions for directed verdict).

## ARGUMENT

**I.     THE COMMISSION HAS SUFFICIENT EVIDENCE OF EACH OF THE ELEMENTS OF ITS EXCHANGE ACT AND SECURITIES ACT CLAIMS**

A.   Because Investors Purchased Shares After Defendants Issued Their False Statements and Because Defendants Induced Redeemers to Buy Back into the Fund with Those Same Statements, the Commission Has Established the Elements of Its Claims.

The evidence satisfies the "in connection with" element. In arguing that the Commission cannot satisfy its obligations under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act because it merely alleges that statements were made to investors to induce them not to redeem (Defendants' Memorandum in Support of Summary Judgment Motion ("Def. Br.") at 18-19), Defendants discount or ignore two key points: (1) Investors did purchase Fund shares after Defendants issued their misleading statements of support; and (2) the Securities Act imposes no requirement that the Commission show that any purchase of Fund shares was made.

The "in connection with" element should be "construed 'not technically and restrictively but flexibly to effectuate its remedial purposes.'" Romano v. Kazacos, 609 F.3d 512, 524 (2d Cir. 2010) (quoting SEC v. Zandford, 535 U.S. 813, 819 (2002)). Any statement made in a manner "reasonably calculated to influence the investing public" meets the "in connection with" requirement. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968). Since Defendants made their statements for the sole purpose of influencing investors contemplating investments in the Primary Fund, including those considering purchases of Fund shares, they were made in connection with a purchase of securities.

3

1.   Any Purchase Made After Defendants Published Their False and Misleading Statements of Intent Satisfies the "In Connection With" Requirement Even if No Investor Relied on Them

Defendants concede that the Commission's claims under Section 10(b) of the Exchange Act will succeed if the Commission offered evidence of purchases. (Def. Br. at 19.)  But they dismiss the 1.6 billion shares (Pl. Mov. App'x Ex. 95)[1] actually purchased between 1 p.m. on September 15 and 4:00 p.m. on September 16 (when the Reserve announced the Fund broke the buck).  Most purchases, Defendants claim, were "automated" (Def. Br. at 19), and the rest, unconnected to the misstatements because Defendants could identify "only six" who received any communication from the Reserve, and none bought while *Insights* was posted on the Reserve's website.  (Id. at 19-20.)  None of these arguments is supported by law or fact.

As a factual matter, Defendants' assertions about the nature and number of purchases are almost impossible to assess because they offer no indication of which purchases support their various factual conclusions.  So, for example, whether a purchase is "automated" or not is a claim Defendants ask the Court to accept on their say so.  (Gareis Decl. ¶ 24.)  Second, if Defendants' use of the label "automated" is meant to convey that these purchases were not the product of any investment decision, they are wrong.  Defendants' own documents show that broker sweeps stopped after the Fund publicly announced it had broken the buck.  (Counter 56.1 ¶ 114 (RBC Wealth Management, for example, purchased 23 million shares on September 16 at 3:08 p.m., then no further purchases on the 17th).).  If truly automated, one would have expected those purchases to have continued so long as the Fund was accepting them (which it continued to do on the 17th), but instead, they stopped when Defendants publicly retracted their vow of support.  Someone decided to stop the "automated" purchases for those accounts when they

---

[1] References to "Pl. Mov. App'x Ex. __" are to the Exhibits included in the Commission's Appendix, submitted in Support of Plaintiff's Motion for Summary Judgment on May 13, 2011.

4

learned that the Fund broke the buck, and they could have done so earlier had Defendants made full disclosure of the limits on and conditions to their support.

As to the non-"automated" purchases, Defendants acknowledge that there were six of them during the post- 1 p.m. period. (Def. Br. at 19-20.) That is enough to satisfy even Defendants' view of the "in connection with" test. SEC v. Mannion, No. 10-cv-3374-WSD, 2011 WL 2270856, at *8 (N.D. Ga. June 2, 2011) ("in connection with" element adequately pled where complaint alleged that just one purchase had been made into fund while defendants were publicly making fraudulent statements). But Defendants seem to argue that six is too few (Def. Br. at 20), and that the Commission must show that some greater majority of purchasers heard Defendants' message. In pressing for that causal connection between message and purchase, however, Defendants impose a reliance element that does not apply in enforcement cases such as this one. Berko v. SEC, 316 F.2d 137, 143 (2d Cir. 1963) (whether investors relied on misrepresentation or were injured is "legally irrelevant"); SEC v. Kelly, No. 08 Civ. 4612, 2011 WL 135845, at *16 (S.D.N.Y. Jan. 7, 2011) (Def. Br. at 31-32); accord SEC v. Pirate Inv. LLC, 580 F.3d 233, 239 n.10 (4th Cir. 2009).[2]

Finally, Defendants ignore two facts that make their position untenable. First, they assume that because no purchases were recorded by Defendants while *Insights* was posted on the Reserve website, no purchases could have been made in reliance on that publication. (Def. Br. at 20.) Even putting aside the legal irrelevance of reliance, Defendants do not address the possibility that investors who saw the posting made their purchases later in the day, and ignore

---

[2] Even in private cases, where reliance is an element, no reliance need be shown for those who bought in the face of material omissions. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-154 (1972) (where defendants failed to disclose facts, "proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material"). For that reason, too, it would not matter if no purchaser received Defendants' public communication.

purchasers who were assured by a copy of *Insights* that was read to them over the phone or emailed to them. Nor do Defendants acknowledge that the Reserve's records for transactions during that period are wholly unreliable as to time, such that transactions were not recorded contemporaneously with investors' redemption or purchase requests. (See, e.g., Counter 56.1 ¶ 110.) Thus, the Reserve's records of purchases do nothing to support the claimed irrelevance of Defendants' misstatements to investor decision-making.

Defendants also ignore the disinformation they conveyed to the ratings agencies and the *Wall Street Journal* and the ramifications of that campaign on investors. Primary Fund investors were watching the market in the aftermath of Lehman's bankruptcy and monitoring, in particular, news from the ratings agencies. (Pl. 56.1[3] ¶¶ 34, 78.) Had Moody's or Standard & Poor's lowered the ratings assigned to the Fund,[4] many investors whose investment guidelines required that they select only top-rated money market funds would not have made the investments that they did. Thus, whether RMCI personnel communicated the false assurances of the Fund's safety directly to investors, or simply relied on the ratings agencies to convey the same message through a failure to issue a credit watch or downgrade, all purchases were made while Defendants' materially misleading statements had been publicly disseminated.[5]

---

[3] References to "Pl. 56.1 ¶ __" refer to the Statement of Undisputed Fact submitted by the Commission on May 13, 2011 with the Commission's Motion for Summary Judgment.

[4] According to their published criteria, each of the ratings agencies would have put the Fund on credit watch, if not downgraded it, had they known that the Bents' statement of support was qualified and conditional. (Pl. Mov. App'x Exs. 80 (Rizzo (S&P) Decl. ¶¶ 6, 8); 79 (Shilling (Moody's) Decl. ¶¶ 9, 10).)

[5] Defendants argue that they did tell the ratings agencies when they decided to withdraw their pledge of support. (Def. Br. at 14.) But the telephone records they cite refute that contention. (Counter 56.1 ¶ 127 (phone records show no calls by Bent II at those times to ratings agencies).) Nor is the latest claim consistent with Bent II's testimony about those events, in which he (in his personal capacity and as RMCI's 30(b)(6) designee) did not recall anything he discussed with the ratings agencies on September 16, or even whether he spoke with them at all. (Id.)

2.      Defendants Ignore that the Securities Act and Advisers Act Contain
        No "In Connection With" Element at All

Defendants are wrong to argue that the Commission must prove a purchase with respect to its claims under Section 17(a) of the Securities Act. (Def. Br. at 18.) Because the Securities Act requires that fraud occur "in the offer or sale" of securities, the Commission need prove no purchase at all. Section 17(a) prohibits false and misleading statements made in the "offer" of securities. 15 U.S.C. § 77q(a); United States v. Naftalin, 441 U.S. 768, 773 (1979). "Offer" is defined by Section 2(a)(3) as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." 15 U.S.C. § 77b(a)(3).

Thus, when Bent II directed Drahzal and his sales force to encourage the redeemers of 10+ billion shares to cancel their redemptions and buy back into the Fund, Defendants engaged in an "offer" of securities. (Pl. 56.1 ¶ 91.) In offering those securities, Defendants repeated the same unqualified, unlimited pledge of support contained in Bent II's 1:19 Email, and a promise of interest for the invested funds. (Counter 56.1 ¶ 61.) Therefore, under Section 17(a), Defendants would be liable for their conduct even if no purchases had been made.

Finally there is no "in connection with" requirement under the Advisers Act. Abrahamson v. Fleschner, 568 F.2d 862, 877 (2d Cir. 1977) (reading an "in connection with" requirement into the Advisers Act "would lead to a construction of the Advisers Act clearly inconsistent with the intent of Congress . . . [which] intended to protect investors against frauds committed by investment advisers who managed their clients' funds . . ..") Therefore, even if the Commission had no evidence of purchases, Defendants would still be liable for their misstatements and omissions to both the Board and investors under the Advisers Act.

7

B.    Investors Had Alternatives Available to Them, Establishing Materiality Even
      Under Defendants' Erroneous Test

Long held and recently affirmed Second Circuit precedent holds that materiality is an objective test that does not require a showing that any investor would have acted differently. Litwin v. Blackstone Group, L.P., 634 F.3d 706, 717 (2d Cir. 2011). All that is required is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).[6]

Even an application of Defendants' test of materiality, however, does not advance Defendants' cause because Primary Fund investors had alternatives available to them to avoid harm. Defendants' arguments all rise and fall on the false premise that because no Primary Fund investors could have redeemed after 1 p.m., Defendants' misrepresentations must have been immaterial because no investor could have relied to their detriment on them. (Def. Br. at 20.)

Both purchasers and existing investors had alternatives that Defendants ignore in their briefs. The many purchasers into the Fund on those two days could have avoided harm by passing on Reserve investments entirely or selecting a Reserve fund other than the Primary Fund. Had Defendants disclosed that they would not support the Fund unless the government or a third party stepped in or the markets turned around, the total mix of information available to investors before they made the investment decision to purchase would have been significantly altered.

Even existing investors had a choice. Rather than hold their shares, they could have transferred Primary shares into other Reserve Funds, such as Government or Treasury. Indeed,

---

[6] This rule makes sense, particularly in Commission enforcement actions where there is no requirement that the Commission establish reliance. As noted by one commentator, the test that Defendants proffer – a fact is immaterial if investors had no way to avoid their injury – is "more properly [understood as] an element of reliance," not materiality. E.C. Lashbrooke, Jr., The Alternative –Action Requirement: The Derailment of Santa Fe, 1981 Duke L. J. 963 (1981).

that was a choice Defendants encouraged investors to make. As Drahzal testified, Bent II told him to tell the sales force that they should offer clients the option to move their money from the Primary Fund to another Reserve product. (Counter 56.1 ¶ 124.) And that is exactly what the sales force did, even on September 16. (Id.) Many investors took that option; according to Reserve's records, more than 250 transactions were booked as transfers on September 15 and 16 out of the Primary Fund to some other Reserve fund, amounting to over $50 million. (Pl. Mov. App'x Ex. 96.) All of those investors received their dollar for redeemed Primary Fund shares.

In support of their remarkable contention that there is no evidence that purchasers subjectively regarded Defendants' statement of intent as material (Def. Br. at 22), Defendants cite the Declaration of David Gareis. Mr. Gareis' Declaration in turn cites his analysis of the 62 "non-automated" purchases (as defined by him) into the Fund, and the "six" purchases he determined were connected to Defendants' dissemination of the message of support (all, except one, unidentified). [7] Mr. Gareis then reviewed those purchasers' 30-day investment history, and concluded that they were all "routine, end-of-day investments and not some sort of reaction to any email from RMCI." (Gareis Decl. ¶ 27.) [8]

Mr. Gareis' analysis does not cite any conversations he had with any of the investors. Had he had those conversations, he would have learned that investors who did speak to the

---

[7] Gareis cites the "complete record" of the information that was communicated to investors by RMCI in the emails and recorded telephone calls from those two days. (Gareis Decl. ¶ 25.) But Defendants forget that, by their own admission, not all phone lines were in fact taped, or, if they were, calls from some lines were never produced by Defendants. (Counter 56.1 ¶ 115.) In addition, how Gareis can make the claim that he could identify, let alone listen to, all recorded calls associated with the 62 purchases is inexplicable, given that most of the calls provide very little identification of the non-RMCI speaker. (Id.)

[8] The reliability of Gareis's analysis is further undercut by his overstatement of his experience and qualifications. Gareis swears to his 14 year tenure as Managing Director at the Reserve (Gareis Decl. ¶ 1), but he testified that his brother-in-law, Bent II, hired him in 2003. (Counter 56.1 ¶ 141.)