IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF NEW YORK

RESERVE MANAGEMENT COMPANY, INC.,

*Plaintiff*,

-against-

WILLKIE FARR & GALLAGHER LLP AND ROSE F. DI-
MARTINO,

*Defendants*.

WILLKIE FARR & GALLAGHER LLP,

*Counterclaim Plaintiff*,

-against-

RESERVE MANAGEMENT COMPANY, INC.,

*Counterclaim Defendant.*

11 Civ 7045

<u>ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANTS
TO COMPLAINT AND COUNTERCLAIMS OF WILLKIE FARR
& GALLAGHER LLP FOR UNPAID LEGAL FEES</u>

COME NOW Defendants Willkie Farr & Gallagher LLP and Rose DiMartino

(together, "WF&G" or "Defendants"), and for their Answer to the Complaint of Plaintiff Reserve

Management Company, Inc. ("RMCI" or "Plaintiff") state:

**INTRODUCTION**

RMCI has filed this malpractice action against its former counsel, WF&G.

RMCI, which owes WF&G substantial unpaid legal fees, asserts that, from July 2002 through

April 2009, WF&G labored under a conflict of interest due to its joint representation of RMCI

and the Reserve Primary Fund ("Primary Fund" or "Fund"), the money-market fund that RMCI

created, staffed, and managed.  As a result of that purported conflict, RMCI claims that (i) in 2007, WF&G failed to recommend that RMCI seek indemnification rights from the Fund, (ii) in 2008, WF&G provided advice that allegedly resulted in enforcement proceedings for fraud against RMCI, and (iii) in 2009 and 2010, after WF&G's representation of RMCI ended, WF&G acted deliberately to injure RMCI.

In this Answer, WF&G demonstrates that RMCI's claims are without merit. RMCI has tried to blame anyone and everyone else for actions RMCI itself took.  The ever expanding list of scapegoats has included, at different times, the Independent Trustees, State Street, Lehman, the Federal Reserve and the SEC.  This action is a misguided attempt by RMCI, yet again, to shift responsibility to someone else – RMCI's former counsel.

It is black-letter law that, when a law firm is accused of malpractice, the client thereby waives the attorney-client privilege and the law firm may reveal formerly privileged communications to defend itself.  Accordingly, WF&G provides the following Response to the Complaint to clear up the many misstatements and half-truths in the Complaint, followed by WF&G's specific answers to the allegations of the Complaint and WF&G's counterclaims for the substantial fees RMCI owes to WF&G.

## RESPONSE TO THE COMPLAINT

On September 15, 2008, faced with a run on the Primary Fund, RMCI promised investors, rating agencies, and the independent trustees of the Fund's board of directors (the "Independent Trustees") that it would support the net asset value (or "NAV") of the Fund so that the Fund would not "break the buck" (*i.e.*, fall below $0.995 per share).  RMCI made that same rep-

resentation to WF&G.  By the next morning, RMCI announced that it would not follow through on those promises.

In May 2009, after an extensive investigation, the Securities and Exchange Commission ("SEC") filed an enforcement action against RMCI and its principals, Bruce R. Bent and Bruce R. Bent II, alleging securities fraud and other violations of the securities laws arising from their conduct on September 15, 2008.  Now, more than two years after the SEC action was filed, RMCI has brought this lawsuit against its former counsel in a misguided and transparent attempt to shift responsibility for its conduct to someone else.  But WF&G specifically advised RMCI that it would constitute <u>fraud</u> if RMCI promised investors that it would support the NAV of the Primary Fund and did not intend to follow through on that promise.  Notwithstanding that sound advice, RMCI went ahead and made such promises to investors anyway.[1]  RMCI has only itself to blame for any consequences flowing from those statements.

**WF&G's Representation of RMCI and the Primary Fund Did Not Pose a Conflict of Interest.**

WF&G was initially retained by the Primary Fund in July 2002 to assist in the "preparation of various regulatory filings."  In October 2002, RMCI retained WF&G to provide "general advice" regarding "securities law matters."  WF&G's advice in 2002, however, was

---

[1] Lest there be any doubt, WF&G's advice on September 15, 2008, was memorialized in an interview memorandum prepared by Wilmer Cutler Pickering Hale & Dorr LLP, counsel to RMCI and the Bents, less than one month after the events in question.  The Wilmer Hale Memo states in relevant part:  "Goldberg [of WFG] was asked about a statement he made to Bent II when discussing whether to make information about the support agreement publicly available.  Goldberg purportedly warned that if they had disclosed their arrangement without intending to follow through, that would constitute fraud.  Goldberg explained that he did not make the statement doubting the Bents' intent.  He merely thought the statement was premature.  Publicly acknowledging the arrangement would have committed the Bents to support NAV at a time when the agreement had been neither fully drafted nor filed with the S.E.C."  (Emphasis added.)

limited to assisting the Reserve Funds in the preparation and filing with the SEC of post-effective amendments to the Funds' Registration Statements, because the one person at RMCI who was capable of performing that role had quit.  WF&G was also retained to assist RMCI on discrete identified securities law questions, most of which involved investment company matters.

RMCI and the Primary Fund were also represented by other counsel at this time. Dechert LLP has jointly represented RMCI and the Reserve Funds since at least 1997 through 2002, and K&L Gates LLP jointly represented RMCI and the Reserve Funds in 2003 and 2004.

In March 2005, Bruce Bent II (then Senior Vice President, Secretary and Assistant Treasurer of RMCI and Co-Chief Executive  Officer, Senior Vice President and Assistant Treasurer of the Fund) asked WF&G to replace existing fund counsel for the Primary Fund and other funds in the Reserve Funds complex.  WF&G agreed to do so and transmitted a new engagement letter addressed to Bruce Bent II (then Senior Vice President, Secretary and Assistant Treasurer of RMCI and Co-Chief Executive  Officer, Senior Vice President and Assistant Treasurer of the Fund) to the Reserve Funds memorializing the fact that WF&G had been retained by the Reserve Funds, including the Primary Fund, as "fund counsel."  Thereafter, WF&G jointly represented the Primary Fund and RMCI, until WF&G's engagement ended in April 2009.

Contrary to RMCI's allegations, no conflict of interest existed between the Primary Fund and RMCI during WF&G's representation.  During WF&G's representation, all of the Primary Fund's officers were also officers or employees of RMCI, RMCI supervised WF&G's work for the Primary Fund, and RMCI was responsible under its Comprehensive Management Fee Agreement with the Primary Fund for reviewing and paying WF&G's fees as fund counsel.  In addition, beginning in 2005, the Independent Trustees had their own counsel.

It is also common in the mutual fund industry for the same counsel to represent both the fund and its investment adviser. Indeed, according to a survey conducted by the Investment Company Institute, over 45% of mutual funds surveyed are represented by the same counsel as their advisers. This has become the customary practice in the mutual fund industry because, as is the case with the Primary Fund, the adviser establishes the mutual fund and is inextricably intertwined with its affairs. RMCI, which at all times had in-house counsel and had other outside counsel for thirty years before WF&G was retained, was well aware of this. In fact, long before WF&G came on the scene, RMCI and the Reserve Funds were jointly represented by other counsel, including Dechert LLP and K&L Gates LLP.

Moreover, despite RMCI's suggestion, it is not true that WF&G sat on both sides of the table when RMCI's Comprehensive Management Fee Agreement was allegedly approved by the Board in 2005 and 2006. Although not mentioned anywhere in RMCI's Complaint, under Section 15(c) of the Investment Company Act of 1940, it was the Independent Trustees' duty to review, negotiate, and approve RMCI's Comprehensive Management Fee Agreement. (The Independent Trustees had their own counsel.) Any negotiation, by operation of law, was between the Independent Trustees (whom WF&G did not represent) and RMCI. Also, RMCI's General Counsel at the time, Edmund P. Bergen, was a mutual fund lawyer with more than 25 years of experience and was advising RMCI on how to deal with RMCI's Comprehensive Management Fee Agreement and related matters. Because the Funds paid RMCI a Comprehensive Management Fee (where RMCI got to keep any amount that it did not pay out), RMCI was inclined to avoid the use of outside counsel in order to maximize its own profit.

This inclination to avoid using outside counsel whenever possible existed throughout WF&G's relationship with RMCI.  It is not surprising then that RMCI has gone through several law firms over the years:  Dechert LLP, K&L Gates LLP, Wilmer Hale, and Dewey & LeBoeuf are just a few that have been hired and fired by RMCI.  The desire to eschew the use of outside counsel may explain the occurrence of some of the problems that outside counsel then had to be brought in to fix, such as those discussed in the next section.

RMCI is simply wrong that WF&G's "dual representation" posed a conflict of interest or in any way prejudiced the legal advice provided by WF&G to RMCI.

**Upon Being Retained As Fund Counsel, WF&G**
**Discovered Serious Preexisting Legal Violations**

Under the Investment Company Act of 1940, a majority of the Primary Fund's board of trustees are required to be "independent" from RMCI.  Within a short time after WF&G's retention, in or about March 2005, Ms. DiMartino discovered that the Primary Fund had been operated for several <u>years</u> (*i.e.*, since June 18, 1997) by RMCI (when it was represented by other counsel) in violation of that clear rule.[2]  In addition, RMCI had also failed to get <u>any</u> Board approval for advisory agreements and distribution plans for some Reserve Funds or series – a violation of some of the most basic and fundamental protections in the Investment Company Act of 1940.

Because of these violations, RMCI's Comprehensive Management Fee Agreement had terminated as a matter of law.  As a consequence, RMCI had been paid over $450 mil-

---

[2] The Primary Fund had put on its board people who had connections to brokers that sold its shares.  RMCI previously sued two of its prior counsel for malpractice over this matter, but then dropped that lawsuit.

lion pursuant to an invalid contractual arrangement.  In addition, the Funds' distributor Resrv

Partners, Inc. (an affiliate of RMCI also controlled by the Bents) had also been paid over $100

million pursuant to an invalid contractual arrangement.

After WF&G identified this problem and called it to RMCI's attention, RMCI's

mandate to WF&G was clear:  fix RMCI's problem.  WF&G, in conjunction with two consecu-

tive RMCI General Counsels, proceeded to do just that.  WF&G helped RMCI to reconstitute

(properly) the Funds' board of trustees, prepare corrective disclosures by the Funds and SEC fil-

ings, and ultimately conduct a proxy vote to obtain the approval of the Fund shareholders of a

new Comprehensive Management Fee Agreement and the retroactive approval of the retention of

all fees that had previously been paid to RMCI during the ten-year period since its contract had

lapsed.

Notably, the SEC threatened to order RMCI to disgorge all of its profits earned

during the relevant years in which the Fund board had not been properly constituted.  As RMCI

itself has judicially admitted, it was through the hard work of WF&G that RMCI was ultimately

able to convince the SEC to retreat from its initial insistence on the disgorgement of all fees

earned by RMCI.  This saved RMCI over $450 million and Resrv Partners over $100 million for

the Primary Fund alone.

In soliciting Fund shareholder approval, RMCI instructed WF&G that, to ensure

shareholder approval, it was critical for RMCI to be able to represent to shareholders in the

proxy that no changes had been made to its Management Agreement.  Indeed, the proxy states

that "the fees and terms (including the obligations of RMCI) of each New Management Agree-

ment are identical to those under the 'Comprehensive Fee' Investment Management Agree-

ments." Similar statements were made in several other places in the proxy. RMCI did not request WF&G to obtain indemnification from the Fund as part of this process, it would have been inconsistent with RMCI's instructions and proxy disclosures, and it was not standard then and is not standard now.

RMCI received the required number of Fund shareholder votes and its fees were approved retroactively.

### RMCI "Misplaces" $15 Million Held By The Primary Fund

In or about August 2005, while WF&G was assisting RMCI to reconstitute the Fund board and solve one problem, the Primary Fund's accountants discovered another: the Primary Fund's custody account was short by approximately $15 million. It is fair to say that nothing is as basic to running a mutual fund as safeguarding fund assets. The Independent Trustees, WF&G, and the Fund's accountants insisted – over Bruce Bent Sr.'s initial objection that the amount was "de minimis" and could be ignored – that an investigation should be conducted. As the Fund's transfer agent and investment manager, RMCI was responsible for the missing money.

WF&G was engaged to conduct the internal investigation regarding the missing $15 million, along with Grant Thornton, a forensic accounting firm. Fund books and records were reviewed and interviews were conducted. The SEC was informed and there were numerous meetings and calls with the regulators. WF&G advised RMCI that an enforcement action by the SEC was a realistic possibility – with all the expenses attendant to such a proceeding. Ultimately, however, the shortage was "found" outside the Fund and, the fund having been made whole, the SEC did not pursue the matter.

This episode demonstrated to RMCI that it could incur substantial fees and expenses in connection with the Primary Fund, including in proceedings involving the SEC for which indemnification from the Fund was <u>not</u> available.  Indeed, RMCI incurred approximately $200,000 in legal fees, which does not include Grant Thornton's fees.  Notably, RMCI never sought indemnification from the Primary Fund for those fees and expenses.  Nor did RMCI ever explore whether it could obtain indemnification for those or similar expenses.

**The "Failure To Recommend" Indemnification Claim**

RMCI's claim that WF&G committed malpractice by failing to recommend that it change its Comprehensive Management Fee Agreement to include a provision for indemnification is completely untenable.

*First*, the liability provisions of the Comprehensive Management Fee Agreement that was approved by the Board in June 2005 and 2006 had been in existence in essentially the same form for many years before WF&G was retained.  RMCI did not amend its Management Agreement to allow RMCI to seek indemnification from the Fund when RMCI was represented by any of various other outside and inside counsel.  This includes at least two other outside law firms, Dechert LLP and K&L Gates LLP.  That is not surprising because many large investment advisers rely on the same exculpatory provisions that exist in RMCI's Management Agreement and, like RMCI, do not obtain indemnification rights.  Instead, like many other companies, the lack of indemnification is reflected in the economics of the management fee and/or the purchase of insurance to protect against the risk of loss.

*Second*, RMCI was well aware that funds have the ability to provide indemnification except in the case of willful malfeasance, bad faith, gross negligence, or reckless disregard of duty.  In its Bill of Trust the Primary Fund itself provides such indemnification to the Fund's

officers and directors, including Bruce Bent Sr.  Similarly, the Primary Fund's distribution contract with Resrv Partners, Inc. – another entity, like RMCI, controlled by the Bents – also contains an indemnification provision.  The Bents knew how to seek indemnification for their companies when they wished it.  Accordingly, RMCI's assertion that WF&G failed to notify it that "money market funds can agree to indemnify" investment advisers (Compl. ¶ 33) is absurd because they knew that fact all along.  RMCI also cannot credibly claim that it did not know that it "could be sued by a third party such as the SEC" (Compl. ¶ 35) – as discussed above, RMCI itself was being investigated at the time by the SEC for misplacing $15 million in fund assets and WF&G made clear that the investigation could lead to an enforcement action and  RMCI never sought indemnification for the fees it paid WF&G and Grant Thornton.

*Third*, the notion that WF&G should have recommended that RMCI seek unprecedented indemnification rights in 2007 was contrary to RMCI's instructions wishes at the time.  RMCI's then-General Counsel, Edmund P. Bergen, an experienced and capable fund lawyer, was responsible for addressing the contract termination problem discussed above.  As explained above, RMCI was trying to remedy, by retroactive shareholder ratification, the pre-WF&G problem that it had been improperly paid significant management fees under a management agreement that was invalid due to an improperly constituted board.  RMCI instructed WF&G that no changes could be made to its Comprehensive Management Fee Agreement so that it would be able to represent that fact to its shareholders and maximize its chances of obtaining shareholder approval.  Indeed, the only thing that RMCI ever proposed (after the contract termination problem had been identified) was asking its shareholders to pay higher fees – another fact at odds with RMCI's current position, as the Independent Trustees would likely have asked

RMCI to reduce its fees if it had actually expressed interest in seeking indemnification protection.

*Fifth*, RMCI is taking inconsistent positions.  In seeking indemnification for the Bents in the SEC lawsuit, RMCI argued that "the fact that RMCI is a named defendant will add minimally to the Bents' defense costs."[3]  RMCI further explained that "the legal defense costs incurred to date and going forward would not be perceptibly diminished by the elimination of RMCI as a named defendant in the pending suits, and thus none or virtually none of the legal defense costs at issue are attributable solely to RMCI."[4]  In this lawsuit, by contrast, RMCI alleges that RMCI "has incurred millions of dollars in attorneys' fees and expenses for the defense of the SEC action and various proceedings."  (Compl. ¶ 3.)  Those propositions cannot both be true: either RMCI's statement in this lawsuit is false, or its statement in the SEC Action is false.

*Finally*, to the extent that RMCI violated the securities laws as the SEC contends, it would not be entitled to any indemnification.[5]

**September 15 and 16, 2008**

RMCI alleges that WF&G is somehow responsible for the conduct of RMCI and the Bents on September 15 and 16, 2008 that is the basis for the SEC's enforcement action for fraud against them.  That is nonsense.

---

[3] Reply Mem. of Law In Supp. of Defs' Application For Indemnification Expenses, at 13.  *SEC v. RMCI*, Dkt. No. 269.

[4] *Id.*

[5] RMCI also asserts that it should have been entitled to advancement.  That assertion fails for the same reasons as its indemnification claim.  Moreover, RMCI neglects to mention that the Bents were offered advancement so long as they agreed to repay any money advanced (and post a bond as security) in the event it is determined that they are not entitled to indemnification.  The Bents refused to do so.  Given that RMCI is planning to close its doors by the end of this month, this turned out to be a prudent request.

As of Friday, September 12, 2008, the Primary Fund owned $785 million of debt securities issued by Lehman.  Over the weekend, rumors circulated that Lehman was planning to file for bankruptcy.  Because the Primary Fund's Lehman holdings constituted approximately 1.2% of the Fund's assets, RMCI understood that a bankruptcy filing would jeopardize its ability to maintain a NAV of $1.

On Sunday evening, given Lehman's rumored bankruptcy, Ms. DiMartino received an email from RMCI's then-General Counsel, Catherine Crowley (RMCI's fourth General Counsel in six years).  Ms. Crowley explained that "[w]e own some Lehman paper, I'm still trying to find out what" and that the Bents' initial reaction to the problems posed by a Lehman bankruptcy was to see if "there's any way we could transfer some of this from our domestic funds to any of our off shore funds" – not exactly the reaction one would expect from an adviser with a fiduciary duty to all its clients, particularly an adviser with as long a history in the asset management business as the Bents.  Ms. Crowley also said that she had contacted a "bankruptcy lawyer" (not at WF&G) that evening for bankruptcy guidance.

On the morning of September 15, 2008, Lehman filed for bankruptcy.  The high redemption activity on September 15 and 16, and the decision to value the Lehman debt securities at below par, ultimately caused the NAV of shares in the Fund to fall below $1.00.  The Fund thereafter suspended the payment of redemptions for seven days and applied for relief from the SEC to suspend payment of redemptions for a longer period.

WF&G's role on those two days was to provide legal advice concerning the Primary Fund's and RMCI's obligations under the Investment Company Act of 1940 and SEC regulations promulgated thereunder.  Joel Goldberg and Rose DiMartino – two highly respected 1940

Act experts – handled the matter.  Mr. Goldberg and Ms. DiMartino each had over 25 years of experience counseling mutual fund and adviser clients, and Mr. Goldberg had also previously served as the Director of the SEC's Division of Investment Management, the division responsible for the oversight of investment companies and investment advisers.

During the morning of September 15, 2008, RMCI became aware that other money funds which held Lehman paper had publicly announced that they were entering into support agreements.  Although unknown to WF&G at the time, RMCI had previously entered into a credit support agreement to maintain the NAV of another fund it advised, the Enhanced Cash Fund.  RMCI decided that it wished to explore a similar arrangement for the Primary Fund, at least in part because the rating agencies were asking RMCI to do so to keep the Fund's AAA rating.  WF&G counseled RMCI and the Primary Fund as to what would be required under the 1940 Act, including SEC issuance of a no-action letter with an accompanying credit support agreement.  And, to that end, during a 1:00 p.m. board call, RMCI obtained the board's consent to approach the SEC to discuss RMCI's proposed credit support agreement.  (Also unknown to WF&G at the time, RMCI had booked a receivable in another two funds, the effect of which was to prevent them from "breaking the buck" – and the probable announcement that such an event would trigger.)

During the 1:00 p.m. board call, RMCI represented to the Independent Trustees and WF&G that it would support the NAV of the Primary Fund at $1 per share so that it did not "break the buck," and that it had the financial wherewithal to do so.  WF&G then contacted the SEC, explained RMCI's intent, and requested examples of acceptable support agreements that WF&G could use as precedents.  WF&G prepared the required draft documents that same after-

noon.  Indeed, within two hours of the receipt of these documents, WF&G sent a draft no-action letter to RMCI's General Counsel and subsequently followed up with a draft credit support agreement.  As RMCI had instructed, those drafts reflected a commitment of support by RMCI of $10 million, although Bruce Bent Sr. and Bruce Bent II indicated this amount could be increased if more money were required.  Ultimately, the draft No Action Letter and Credit Support Agreement were never finalized by RMCI or filed with the SEC.

On September 16, 2008, with no credit support agreement in place, the Primary Fund announced that it "broke the buck" and suspended redemptions.

**The "SEC Lawsuit" Claim**

It is difficult to understand from the Complaint what RMCI alleges Mr. Goldberg and Ms. DiMartino did wrong on September 15 and 16, 2008.  Even tape-recorded conversations of parts of board meetings, as well as board minutes, on those dates show Mr. Goldberg and Ms. DiMartino ably counseling the board and management.  Nevertheless, RMCI asserts that the "SEC is seeking to hold RMCI and the Bents liable for actions *taken by the Willkie firm.*" (Compl. ¶ 42 (emphasis in original).)  The sole basis for this allegation appears to be that WF&G, "on behalf of RMCI, prepared a draft no-action letter and credit support agreement" and that "such documents contained a material limitation not found in RMCI's statements to investors and the Fund's Board of Trustees made earlier that day."  (*Id.*)

As an initial matter, RMCI affirmatively alleges that "the SEC's allegations are without merit, and the defendants in that Action should not be found liable for wrongdoing."

(Compl. ¶ 3.)  If that is true, then even under RMCI's view of the facts the legal advice about which RMCI complains could not have been negligent.[6]

In any event, as the Complaint itself recognizes, the two documents at issue – a draft no-action letter and draft credit support agreement – were prepared after RMCI started promising investors unconditionally that it would "support the NAV to whatever degree is required."  Nor were those two draft documents ever finalized because the Bents ultimately never agreed to support the Fund's NAV conveyed to investors.  It therefore makes no sense for RMCI to suggest that these two documents are the basis for the SEC's lawsuit, when the SEC is challenging RMCI's actual statements to investors.  (WF&G hereby incorporates by reference the SEC's motion for summary judgment and supporting papers.)

It is also not accurate for RMCI to assert that the SEC's lawsuit is based on the allegation that "such documents contained a material limitation not found in RMCI's statements." (Compl. ¶ 42.)  The "material limitation" referenced in the Complaint presumably refers to the $10 million support that was included in the initial drafts.  That number was inserted at the direction of the Bents – WF&G did not come up with the number and cannot be held responsible for it.  Moreover, as noted above, the Bents made clear to WF&G on September 15 that the $10 million was a starting point and RMCI could provide more money if more was required.  Indeed, RMCI has affirmatively asserted in the SEC lawsuit that "Bent Sr. told DiMartino that the amount of credit support could be increased to more than $10 million" and that assertion is undisputed by the SEC.[7]  WF&G had no reason to doubt, and did not doubt on September 15,

---

[6]  Indeed, this affirmative allegation is a judicial admission which causes this portion of the Complaint to fail to state a cause of action.

[7]  Statement of Undisputed Facts by Defendants in *SEC v. RMCI*.

that it was the Bents' and RMCI's intent to support the NAV.  And WF&G told Bruce Bent II

that, if RMCI made statements without intending to follow through, then that could constitute

fraud.

The SEC's lawsuit, by contrast, is not based on any "material limitation" con-

tained in the documents drafted by WF&G.  Rather, the SEC asserts in its motion for summary

judgment that RMCI's promises of unconditional support for the $1 NAV were false because:

> As they admit, Defendants only intended to support the $1 NAV – in fact,
> only were *able* to adequately support the Fund's NAV – if they could find
> third-party financing, or they could get the federal government to bail the
> Fund out.  And, as Defendants also admit, they assumed that the rate of
> redemptions would slow and that the credit markets would open back up,
> allowing them to sell their liquid assets; in other words, they only intended
> to support the Fund if their message of support bought them enough time
> to stay afloat until market conditions improved and no support would be
> necessary.[8]

WF&G was not told about any of the above undisclosed qualifications on RMCI's promises to

support the NAV.  In fact, WF&G advised RMCI that, to obtain the requisite no-action letter for

the capital support agreement, RMCI would need to place in escrow money equal to its commit-

ment and RMCI never said that it would not or could not do that.

RMCI nonetheless makes the untenable claim that WF&G is responsible for

RMCI's statements to investors and the SEC's lawsuit arising from those statements.  WF&G in

fact advised Bruce Bent II on September 15 that, if RMCI told investors that it would support the

NAV and did not have the intent to follow through on that promise, it could be liable for fraud.

WF&G offered that advice not because it doubted RMCI's intent to support the NAV, but be-

---

[8] *See* SEC's Motion for Partial Summary Judgment, Opening Brief, at 2, *SEC v. RMCI*, Dkt.
No. 380.

cause it is prudent not to make statements to investors prematurely. RMCI ignored that advice and acted with full knowledge that its statements to investors, if untrue, would amount to fraud.

In short, RMCI did not apprise WF&G of the relevant facts and did not heed WF&G's advice. That is not malpractice in any court in the land.

**After The Primary Fund "Broke The Buck," WF&G Defended RMCI Until RMCI Stopped Paying Its Legal Bills**

After the Primary Fund "broke the buck," dozens of lawsuits were filed against RMCI, the Primary Fund, and the Bents in state and federal courts across the country by both shareholders and state regulators. WF&G devoted substantial resources to defending those lawsuits and was highly successful, obtaining temporary relief from the SEC, defeating motions for temporary restraining orders and preliminary injunctions, and persuading the Judicial Panel on Multidistrict Litigation to consolidate all actions – including state court actions commenced by state regulators – in the Southern District of New York.

WF&G was not the only law firm representing the Bents at this time. Shortly after the Primary Fund "broke the buck," at WF&G's urging, the Bents retained Wilmer Cutler Pickering Hale & Dorr LLP ("Wilmer Hale"). (Other counsel were also interviewed at WF&G's suggestion.) Wilmer Hale defended the Bents' depositions during the SEC's investigation, prepared a Wells submission for RMCI and the Bents, and handled substantive discussions with the SEC. Any suggestion in the Complaint that WF&G never suggested that RMCI seek separate counsel, or that RMCI did not have separate counsel and was relying solely on WF&G, is simply wrong.

At the time, contrary to its current allegations, RMCI was pleased with WF&G's results and praised WF&G. For example, when the MDL Panel conditionally transferred a secu-

rities lawsuit filed by the Colorado securities regulators to the Southern District of New York, Wilmer Hale reported to Bruce Bent II that "this is a big win," that WF&G had done "first rate work," and that Tariq Mundiya (a WF&G partner) was "magnificent." Similarly, when RMCI's current counsel replaced WF&G and accused WF&G in April 2009 of "code of conduct violations," RMCI apologized for those allegations, said they were "uncalled for," and stated that WF&G had done a "terrific job" for RMCI.

Although RMCI was satisfied with WF&G's work, it did not want to pay for it starting in January 2009. Unwilling to leave RMCI in the lurch, and with assurances of eventual payment, WF&G continued to dedicate substantial resources to RMCI's defense until RMCI identified replacement counsel. Over the next three months, WF&G incurred over $3 million in legal fees – fees that remain unpaid to this day.

Ultimately, WF&G decided that it could not continue to represent a client that owed over $3 million and does not pay its bills and told RMCI that the engagement had to end. By letter dated April 9, 2009, Bruce Bent II terminated WF&G's engagement for RMCI. Notably, in that letter, Bruce Bent II expressly acknowledged that WF&G would continue to serve as counsel to the Primary Fund.

RMCI's allegation that WF&G withdrew as counsel for RMCI because of a "conflict of interest" identified by the SEC is just false. (Compl. ¶¶ 59-60.) WF&G's representation ended because RMCI stopped paying WF&G's legal bills and owes WF&G a substantial amount of money. In fact, on April 3, 2009, a few days before RMCI terminated WF&G's engagement, RMCI candidly wrote: "While we might not pay you for them, we certainly appreciate your efforts."

**RMCI's Baseless Complaints About WF&G Post-Representation Conduct**

As discussed above, WF&G's representation of RMCI ended on April 9, 2009, because RMCI stopped paying WF&G's legal bills.  At that time, Bruce R. Bent II, on behalf of RMCI, expressly acknowledged in writing "that Willkie shall continue to serve as outside counsel to the Reserve Funds."  Based on that representation and acknowledgement, and the absence of any conflict, WF&G has continued to represent the Reserve Funds, including the Primary Fund.

RMCI contends that, since its withdrawal, WF&G has "taken a number of positions directly and improperly adverse to RMCI."  (Compl. ¶ 62.)  RMCI made the same unfounded accusation a year ago, when it tried to strong-arm WF&G into withdrawing as counsel for the Primary Fund.  In October 2010, WF&G met with Bruce Bent Sr. and RMCI's current General Counsel, Catherine Birch, to discuss the matter.  During that meeting, Bruce Bent Sr. explained that his real complaint is that WF&G had not affirmatively "supported" or "helped" RMCI to develop "creative" solutions to RMCI's disputes with the SEC and Independent Trustees – which WF&G has no obligation to do for its former client.  Bruce Bent Sr. also made the astonishing suggestion that Ms. DiMartino acted improperly by providing *truthful* deposition testimony before the SEC that he did not like.  On December 6, 2010, faced with RMCI's repeated threats to seek disqualification and concerned about the disruptive impact this would have on the liquidation of the Funds, WF&G raised the issue with Judge Gardephe.  RMCI never responded to that letter, and let the matter drop.

RMCI's complaints are as baseless now as they were a year ago.  Indeed, RMCI has lodged against the SEC and the Independent Trustees in the SEC litigation some of the very same complaints that it is now raising against WF&G.  For that reason, the SEC has observed

that RMCI has "a view of the factual record that is completely at odds with reality."[9]  We address each of RMCI's complaints, in turn, below.

*First*, RMCI asserts that, on October 6, 2009, "acting at the behest of the SEC . . . DiMartino contacted RMCI's insurer and improperly obstructed the release of the proceeds of [an insurance] policy to RMCI." (Compl. ¶ 63.)  The Complaint fails to mention, however, that RMCI had grabbed all of the proceeds ($10 million) for itself without notifying any of the other parties insured under that same insurance policy, including the Primary Fund, the Reserve Short-Term Investment Trust, the Independent Trustees, and others.  (At the time, the Reserve Funds were WF&G's sole clients.)  The Complaint also fails to mention that, at the time, a dispute existed over the entitlement to those proceeds, that the funds were subject to the Court's jurisdiction, and that WF&G's purported "obstruction" consists of nothing more than notifying an insurance carrier of those <u>facts</u>.  Finally, the Complaint fails to mention that, in exchange for an advance of $5 million to RMCI from the Fund, RMCI agreed to submit the issue of the insurance proceeds' disposition to the Court.  The Court thus had the following to say when RMCI made the same "obstruction" charge against the SEC:

> I might say that the argument that the SEC is responsible for the failure of, for example, the insurance proceeds to be distributed or for indemnification payments to be made or management fees to have been paid I think is grossly unfair  Everyone in this room knows those matters have been before me for quite some time.
>
> … The reason why those issues have not been resolved, in my judgment, hasn't been because of obstruction or anything else that the SEC has done. The issues have been laid before me and I haven't resolved those issues, because I found them difficult to resolve.  That is the true reason of why we are where we are today with respect to the insurance proceeds against which there are competing claims.  That is the true reason.  That is why

---

[9] SEC Mem. Of Law In Opp. To Defs' Mot. to Strike, at 1, *SEC v. RMCI,* Dkt. No. 431.

those issues haven't been resolved.  It's not the fault of anyone sitting here today.  The issues have been laid before me, and I haven't resolved them. That's the truth.[10]

*Second*, RMCI alleges that Ms. DiMartino "threatened" that "the Fund would issue a press release attacking Bent Sr. on an irrelevant and untrue matter."  (Compl. ¶ 66.)  But Ms. DiMartino did not "threaten" anything on behalf of the Fund, did not have the authority to "cause" the Independent Trustees or the Fund to issue press releases, and no such press release was ever issued (which means RMCI was in no way damaged).  To the contrary, RMCI objected to the inclusion of the true statement that the Independent Trustees had proposed not to renew RMCI's Management Agreement before RMCI provided notice that it was terminating that Agreement – which RMCI did when it knew that the Independent Trustees were still in the early stages of trying to find a successor.  In other words, RMCI did not want the public to know that the Independent Trustees were going to fire RMCI before RMCI had provided notice that it was terminating the Agreement.  The press release that was ultimately issued removed the language that RMCI found objectionable.  In any event, this had nothing at all to do with WF&G's prior representation and cannot serve as the basis for an ethical violation or disqualification.

*Third*, RMCI asserts that WF&G's "contention as the Fund's counsel" that it is acceptable for the Fund to pay WF&G's ordinary course fees as fund counsel, but not RMCI's requested fees, was improper.  (Compl. ¶ 68.)  As an initial matter, the Independent Trustees are responsible for reviewing and approving WF&G's fees.  No dispute exists over the propriety of those fees.  By contrast, the SEC, Independent Trustees, and Fund investors have raised serious issues over whether RMCI should be paid the fees and expenses it seeks – *i.e.*, fees that RMCI

---

[10] *SEC v. RMCI*, Tr. of Conference before the Hon. Paul G. Gardephe, April 6, 2011, at 37-39.

seeks to charge for managing assets that were not repaid to shareholders when their shares were redeemed, and expenses that are allegedly unrelated to RMCI's management of the Fund. There is nothing "inconsistent" with paying one and not the other. In any event, as noted above, RMCI's purported entitlement to fees and expenses is an issue squarely before the Court over which neither the Independent Trustees nor WF&G has any control.

*Fourth*, RMCI asserts that WF&G improperly "engineered" the "without cause removal of Bent Sr. from the Fund's Board of Trustees." (Compl. ¶ 70.) The removal of Bruce Bent Sr. was a lawful decision made by the Independent Trustees – not WF&G or Ms. DiMartino – because RMCI was no longer the Fund's adviser. No further reason existed for Bruce Bent Sr. to sit on the board of a fund in liquidation that RMCI was no longer managing. The Independent Trustees were advised by Delaware and Massachusetts counsel and their independent counsel about the legality of the changes proposed to be made. Moreover, the Complaint does not, and cannot, allege how Bruce Bent Sr.'s removal damaged RMCI.

*Finally*, RMCI alleges that WF&G "worked with the SEC to alter the unanimously approved September 15, 2008 minutes of the Fund's Board meeting in an attempt to bolster certain allegations in the SEC's case." (Compl. ¶ 74.) RMCI further alleges that this supposed "alteration" would make the minutes "inaccurate." (*Id.* ¶ 75.) These allegations, too, are without merit.

RMCI's allegations relate to the amount of redemptions that is reported in board minutes for a 1:00 p.m. meeting on September 15, 2008. The minutes of that meeting indicate the Primary Fund had received redemptions of $16.5 billion, but the Independent Trustees have no recollection of being *told* that $16.5 billion number on September 15 and minutes from an

Executive Session held the next day indicate that they were told at 1:00 p.m. on September 15 that the level of redemptions was approximately $5 billion.  In September 2010, Ms. DiMartino was asked by the Independent Trustees to report in the full board meeting the Independent Trustees' conclusion that, even if, as a <u>factual matter</u>, the actual redemption level was $16.5 billion, the Independent Trustees did not recall that $16.5 billion was actually communicated to them at 1:00 p.m. on September 15, 2008, and the minutes should be clarified to so reflect.

Putting aside the initial origin of the $16.5 billion figure, WF&G did not "work[]" with the SEC to alter" anything.  Four witnesses have now provided uncontroverted and incontrovertible deposition testimony that the SEC had nothing to do with the statements made at the September 2010 board meeting.  To the contrary, the Independent Trustees made the decision on their own to clarify that the amount of redemptions was merely a factual statement and not something that the Independent Trustees recalled they were told during the meeting.  The record is also clear that WF&G had no contact whatsoever with the SEC on the subject.  Accordingly, RMCI has no basis whatsoever to allege that WF&G "worked with the SEC" and it is simply not true.[11]

Nor did the clarification render the minutes inaccurate – the initial draft of the minutes was prepared with an $8 billion redemption figure and that number was increased at the

---

[11] RMCI can only assert otherwise by selectively quoting from a letter that WF&G sent to RMCI in October 2010.  That letter explained, as is also set forth above, that the decision to clarify the board minutes was that of the Independent Trustees alone.  The letter states in relevant part:  "As you know, the SEC has for a long time questioned whether RMCI in fact communicated to the Independent Trustees the level of redemptions reflected in the September 15, 2008 board minutes.  It is our understanding that the Independent Trustees, advised by their own counsel and in response to the SEC, would like to clarify for the record that the figure reported in the board minutes is merely a factual statement, and not necessarily something that they were told at the time.  Ms. DiMartino has nothing to do with that decision, and did not cause, and could not cause, the Independent Trustees to 'consider altering' board minutes."

direction of Wilmer Hale and RMCI's General Counsel Catherine Crowley in late October.  In fact, RMCI has now judicially admitted in court filings in the SEC action that "the Primary Fund had not received $16.5 billion in redemption requests as of 1:00 P.M."[12]

We now answer each of RMCI's specific allegations in the next section of this Answer.

## ANSWERS TO COMPLAINT ALLEGATIONS[13]

1.    Defendants deny the allegations in Paragraph 1, except admit that Plaintiff has filed a legal malpractice action against Defendants.  Defendants further state that, for the reasons discussed in detail above, this action has no merit.

2.    Defendants deny the allegations in Paragraph 2, except admit that the Reserve Primary Fund is a money market mutual fund; that RMCI was formerly the investment adviser of the Primary Fund; that based upon publicly available information the Primary Fund had assets of approximately $62.5 billion prior to September 2008, including commercial paper issued by Lehman Brothers Holdings Inc. ("Lehman"), which have now been substantially liquidated; and that Lehman declared bankruptcy on September 15, 2008.

3.    Defendants deny the allegations in the first sentence of Paragraph 3, except admit that, in May 2009, the SEC commenced an action against RMCI, Bruce Bent, Sr., Bruce Bent II, and Resrv Partners, Inc.  To the extent the allegations in the second sentence of Paragraph 3 state a legal conclusion, no response is required.  To the extent a response is required to the allegations in the second sentence of Paragraph 3, Defendants deny knowledge or information suffi-

---

[12] RMCI's Counterstatement to Rule 56.1 Statement, ¶ 88, *SEC v. RMCI*, Dkt. 390.

[13] Defendants have deleted in this Answer the headings included in the Complaint, to which no response is required.  To the extent that a response is required to those headings, they are denied.

cient to form a belief as to those allegations. Defendants further deny knowledge or information sufficient to form a belief as to the allegations in the third sentence of Paragraph 3, and state that this allegation is inconsistent with statements made by RMCI in the SEC action.

4. Defendants deny the allegations in Paragraph 4.

5. Defendants deny the allegations in Paragraph 5, except admit that WF&G provided legal advice to RMCI relating to the Investment Company Act of 1940 on September 15-16, 2008. For the reasons discussed above, Defendants vigorously deny that any advice provided to RMCI was negligent.

6. Defendants deny the allegations in Paragraph 6.

7. Defendants deny the allegations in Paragraph 7.

8. Defendants deny the allegations in Paragraph 8, except admit that WF&G jointly represented the Primary Fund and RMCI between September 15, 2008 and April 9, 2009, and that WF&G continued to represent only the Fund after April 9, 2009. As discussed above, that joint representation did not give rise to any conflict of interest and is common in the mutual fund industry.

9. Defendants admit the allegations in Paragraph 9.

10. Defendants admit the allegations in Paragraph 10.

11. Defendants deny the allegations in Paragraph 11, except admit that Rose DiMartino is a partner of WF&G and that Ms. DiMartino resides in New York County.

12. Paragraph 12 states a legal conclusion as to which no response is required.

13. Paragraph 13 states a legal conclusion as to which no response is required.

14.    Defendants admit that a money market fund is an open-ended mutual fund that invests in short-term debt securities, which may include United States Treasury bills and commercial paper, and refer to Rule 2a-7 promulgated under the Investment Company Act of 1940 for its contents.

15.    Defendants admit that money market funds are regulated by the SEC pursuant to the Investment Company Act of 1940.

16.    Defendants deny the allegations in Paragraph 16, except admit that Bruce Bent Sr. has been in the money market fund business since 1971, and the money market fund industry has trillions of dollars of assets under management overall and serves the needs of tens of millions of investors.

17.    Defendants admit that money market funds hire investment advisers and other providers to manage their assets in exchange for fees.

18.    Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, except admit that Bruce Bent Sr. has served as Chairman, President, and Treasurer, and as a trustee of the Primary Fund.

19.    Defendants admit that RMCI served as the investment adviser to the Primary Fund and that Bruce Bent Sr. was RMCI's Chairman and Bruce Bent II its Co-Vice Chairman and President.

20.    Defendants admit that RMCI's relationship with the Primary Fund was governed by a management agreement that was amended from time to time.

21.    Defendants refer to RMCI's Management Agreement for its contents.

22.    Defendants deny the allegations in Paragraph 22.

23.    Defendants deny the allegations in Paragraph 23.

24.    Defendants deny the allegations in Paragraph 24.

25.    Defendants deny the allegations in Paragraph 25.

26.    Defendants deny the allegations in Paragraph 26, except refer to WF&G's engagement letters with RMCI and the Primary Fund for their contents.

27.    To the extent the allegations in Paragraph 27 state a legal conclusion, no response is required.  To the extent that a response is required, Defendants deny the allegations.

28.    Defendants deny the allegations in Paragraph 28.

29.    Defendants deny the allegations in Paragraph 29, except admit that WF&G jointly represented RMCI and the Primary Fund in 2007.  Defendants further state that (i) no conflict of interest arose from this joint representation, which is common in the mutual fund industry, (ii) the reason the Management Agreement was amended in 2007 was because RMCI had previously been receiving fees pursuant to an invalid Management Agreement, (iii) RMCI instructed WF&G to make no changes to its preexisting Management Agreement, which had been prepared by prior counsel other than WF&G, and (iv) pursuant to the Investment Company Act of 1940, the Independent Trustees of the Primary Fund, represented by their own counsel, were responsible for negotiating and approving RMCI's Management Agreement on behalf of the Primary Fund.

30.    Defendants deny the allegations in Paragraph 30.

31.    Defendants deny the allegations in Paragraph 31, except refer to Paragraph 9 of the Management Agreement for its contents.

32.     Defendants deny the allegations in Paragraph 32, except refer to the Management Agreement for its contents.

33.     To the extent that the allegations in Paragraph 33 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 33 and refer to the Investment Company Act of 1940 for its contents.  Defendants further state that, while the Investment Company Act of 1940 permits funds to indemnify their advisers, many advisers do not obtain indemnification.  Rather, as discussed above, the lack of indemnification is reflected in the economics of the management fee and/or the purchase of insurance to protect against the risk of loss.  Moreover, the Bents were well aware of this fact because they chose to obtain indemnification for certain of their companies, including Resrv Partners, Inc., and themselves pursuant to the Fund's Declaration of Trust.  By contrast, they chose not to obtain indemnification for RMCI long before WF&G was retained, when they were advised by different outside and inside counsel.  Nor did they seek indemnification when they were the subject of a prior SEC investigation relating to the loss of $15 million of fund assets.

34.     To the extent that the allegations in Paragraph 34 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 34 and refer to the Investment Company Act of 1940 for its contents.

35.     Defendants deny the allegations in Paragraph 35.

36.     Defendants deny the allegations in Paragraph 36.

37.     Defendants deny the allegations in Paragraph 37.

38.     Defendants admit that Lehman filed for bankruptcy on September 15, 2008.

39.     Defendants deny the allegations in Paragraph 39, except refer to the public record for its contents.

40.     Defendants deny the allegations in Paragraph 40, except admit that meetings of the Board of Trustees of the Primary Fund were convened at approximately 8:00 am, 9:30 am, and 1:00 pm on September 15, 2008.

41.     Defendants deny knowledge or information sufficient to form a belief as to the allegations in Paragraph 41.

42.     Defendants deny the allegations in Paragraph 42, except admit that WF&G provided legal advice relating to the Investment Company Act of 1940 to RMCI on September 15-16, 2008, and further state that the record in the SEC's lawsuit against RMCI and the Bents contradicts the allegations in Paragraph 42.

43.     Defendants deny knowledge or information sufficient to form a belief as to the allegations in the first sentence in Paragraph 43, and deny the allegations in the second sentence in Paragraph 43.

44.     Defendants deny the allegations in Paragraph 44, except admit that the SEC filed a lawsuit against RMCI, Resrv, and the Bents in May 2009.  Defendants further state that RMCI has mischaracterized the allegations in the SEC lawsuit and the advice that WF&G actually provided to RMCI on September 15-16, 2008.  Indeed, as discussed above, WF&G specifically advised RMCI that it would constitute <u>fraud</u> if RMCI promised investors that it would support the NAV of the Primary Fund and did not intend to follow through on that promise.

45.     Defendants deny the allegations in Paragraph 45.

46.     Defendants deny the allegations in Paragraph 46.

47.     Defendants deny the allegations in Paragraph 47.

48.     Defendants deny the allegations in Paragraph 48.

49.     To the extent that the allegations in Paragraph 49 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 49.

50.     To the extent that the allegations in Paragraph 50 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 50.

51.     Defendants deny the allegations in Paragraph 51.

52.     Defendants deny the allegations in Paragraph 52.  Defendants further state that, contrary to the allegations in Paragraph 52, RMCI and the Bents retained the law firm of Wilmer Cutler Pickering Hale & Dorr LLP in September 2008 based on the advice of WF&G.  Thereafter the Bents and RMCI engaged Dewey & LeBoeuf and other law firms.

53.     Defendants deny the allegations in Paragraph 53, except refer to WF&G memorandum dated December 3, 2008, for its contents.

54.     Defendants deny the allegations in Paragraph 54.  Defendants further state that, contrary to the allegations in Paragraph 54, RMCI and the Bents retained the law firm of Wilmer Cutler Pickering Hale & Dorr LLP in September 2008 based on the advice of WF&G.

55.     Defendants deny the allegations in Paragraph 55.

56.     Defendants deny the allegations in Paragraph 56.

57.    Defendants deny the allegations in Paragraph 57.  Defendants further state that, contrary to the allegations in Paragraph 57, RMCI and the Bents retained the law firm of Wilmer Cutler Pickering Hale & Dorr LLP in September 2008 based on the advice of WF&G.

58.    Defendants deny the allegations in Paragraph 58, except admit that WF&G collected and produced documents from the files of the Bents, John Drahzal, Eric Lansky, Brandon Semilof, Elliott Goldstein, Ming Hatch, and Ryan Green as part of the SEC's pre-suit investigation.

59.    Defendants deny the allegations in Paragraph 59.

60.    Defendants deny the allegations in Paragraph 60.  Defendants further state that WF&G's representation of RMCI ended because RMCI owed millions of dollars in unpaid legal fees to WF&G.  Defendants further state that Bruce Bent II, on behalf of RMCI, acknowledged expressly and in writing "that Willkie shall continue to serve as outside counsel to the Reserve Funds."

61.    To the extent that the allegations in Paragraph 61 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 61, except refer to the New York Rules of Professional Conduct for their contents.

62.    Defendants deny the allegations in Paragraph 62.

63.    Defendants deny the allegations in Paragraph 63, except refer to any communications between WF&G and RMCI's insurer for their contents.

64.    To the extent that the allegations in Paragraph 64 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 64.

65.     Defendants deny the allegations in Paragraph 65.

66.     Defendants deny the allegations in Paragraph 66.

67.     Defendants deny the allegations in Paragraph 67.

68.     Defendants deny the allegations in Paragraph 68.

69.     Defendants deny the allegations in Paragraph 69.

70.     To the extent that the allegations in Paragraph 70 state a legal conclusion, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 70, except admit that Bruce Bent Sr. is not currently a member of the Board of Trustees of the Primary Fund.

71.     Defendants deny the allegations in Paragraph 71.

72.     Defendants deny the allegations in Paragraph 72, except admit that Bruce Bent Sr. is not currently a member of the Board of Trustees of the Primary Fund.

73.     Defendants deny the allegations in Paragraph 73.

74.     Defendants deny the allegations in Paragraph 74.  Defendants further state that the allegations by RMCI in Paragraph 74 are squarely contradicted by the factual record in the SEC action.

75.     Defendants deny the allegations in Paragraph 75, except refer to Ms. DiMartino's deposition testimony for its contents.  Defendants further state that the allegations by RMCI in Paragraph 75 are squarely contradicted by the factual record in the SEC action.

76.     Defendants deny the allegations in Paragraph 76.  Defendants further state that the allegations by RMCI in Paragraph 76 are squarely contradicted by the factual record in the SEC action.

77.    Defendants deny the allegations in Paragraph 77.  Defendants further state that the allegations by RMCI in Paragraph 77 are squarely contradicted by the factual record in the SEC action.

78.    Defendants deny the allegations in Paragraph 78.

79.    Defendants deny the allegations in Paragraph 79, except admit that, on September 30, 2010, Catherine Birch, General Counsel and Secretary of RMCI, wrote a letter to Rose DiMartino and refer to that letter for its contents.

80.    Defendants deny the allegations in Paragraph 80, except admit that WF&G did not accede to RMCI's threats and intimidation to disqualify WF&G from serving as fund counsel to the Primary Fund.  WF&G further states that, on December 6, 2010, WF&G sent a letter to the Honorable Paul G. Gardephe of the Southern District of New York to raise the conflict issue with the Court.  RMCI never responded to that letter.

FIRST CAUSE OF ACTION
(Legal Malpractice)

81.    Defendants repeat and reallege their answers to the allegations set forth in paragraphs 1 through 80 of the Complaint with the same force and effect as if set forth in full herein.

82.    Defendants deny the allegations in Paragraph 82, except admit that WF&G previously served as counsel to RMCI.

83.    Defendants deny the allegations in Paragraph 83, except admit that WF&G jointly represented the Primary Fund and RMCI between September 15, 2008 and April 9, 2009, and that WF&G continued to represent only the Fund after April 9, 2009.

84.     To the extent the allegations in Paragraph 84 state a legal conclusion, no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 84.

85.     Defendants deny the allegations in Paragraph 85.

86.     To the extent the allegations in Paragraph 86 state a legal conclusion, no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 86.

87.     Defendants deny the allegations in Paragraph 87.

88.     To the extent the allegations in Paragraph 88 state a legal conclusion, no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 88.

SECOND CAUSE OF ACTION
(Breach of Fiduciary Duty)

89.     Defendants repeat and reallege their responses to the allegations set forth in paragraphs 1 through 80 of the Complaint with the same force and effect as if set forth in full herein.

90.     Defendants deny the allegations in Paragraph 90, except admit that, on April 9, 2009, RMCI terminated its engagement of WF&G.

91.     To the extent the allegations in Paragraph 91 state a legal conclusion, no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 91.

92.     To the extent the allegations in Paragraph 92 state a legal conclusion, no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 92.

93.     Defendants deny the allegations in Paragraph 93.

94.     Defendants deny the allegations in Paragraph 94.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses and reserve the right to amend this answer to assert any additional affirmative defenses when and if, in the course of their investigation, discovery, or preparation for trial it becomes appropriate to assert such affirmative defenses.  In asserting these defenses, Defendants do not assume the burden of proof for any issue that would otherwise rest on the Plaintiff.

## FIRST AFFIRMATIVE DEFENSE

The Complaint and both purported causes of action set forth in the Complaint fail to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part by the statutes of limitations.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part by the doctrine of contributory negligence.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part because Plaintiff is estopped from prosecuting this action due to the equitable doctrine of unclean hands.

### FIFITH AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part because Plaintiff directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5].

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part because Plaintiff directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)].

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part because Plaintiff directly violated Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] of the Investment Advisers Act of 1940 ("Advisers Act").

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are all barred in whole or in part because Plaintiff directly violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206-4(8) [17 C.F.R. § 275.206(4)-8] thereunder.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff committed fraud.

### PRAYER FOR RELIEF FOR COMPLAINT

WHEREFORE, Defendants respectfully request that the Complaint be dismissed with prejudice and that they be awarded their costs and attorneys fees, together with such other and different relief as this Court deems just and proper.

## COUNTERCLAIMS

Counterclaim Plaintiff Willkie Farr & Gallagher LLP, by its counsel, alleges the following against Counterclaim Defendant Reserve Management Company, Inc.

1.      This is an action for the collection of unpaid legal fees and expenses for professional services rendered.

2.      WF&G performed legal work for RMCI on a wide variety of issues on the expectation and understanding that Defendants would pay WF&G in full upon receipt of monthly billing statements.  RMCI paid those bills in full until the end of 2008.  RMCI, however, failed to pay any bills for services rendered by WF&G after that time.

3.      Rather than pay its bills, RMCI ended its engagement of WF&G on April 9, 2009.  In total, RMCI did not pay WF&G approximately $3.1 million, plus interest and less any amount on retainer, for legal services rendered.

4.      WF&G now seeks to recover all unpaid legal fees and expenses from RMCI.

### The Parties

5.      Counterclaim Plaintiff Willkie Farr & Gallagher LLP is a limited liability partnership duly existing under the laws of the State of New York.  WF&G has its principal place of business at 787 Seventh Avenue, New York, NY 10019.  At all relevant times, WF&G has been actively engaged in the business of providing legal services.

6.      Counterclaim Defendant Reserve Management Company, Inc. is a corporation organized and existing under the laws of the State of New Jersey.  At all relevant times, RMCI was the investment advisor to The Reserve Fund, an open-end management investment company

registered with the SEC under the Investment Company Act of 1940.  RMCI has its principal place of business at 1250 Broadway, New York, NY 10001.

### Personal Jurisdiction and Venue

7.    This Court has personal jurisdiction over Counterclaim Defendant RMCI, which does business in the State of New York and in this District.  Moreover, Counterclaim Defendant RMCI's conduct occurred in part in the State of New York and in this District.

8.    Subject matter jurisdiction exists for the First, Second, Third, and Fourth Causes of Action of the Counterclaim under 28 U.S.C. § 1367 because these claims are so related to Plaintiff's claims in this lawsuit that they form part of the same case or controversy.

9.    Venue is proper in this District under 28 U.S.C. § 1391(b).

### Factual Allegations

10.    On September 15, 2008, Lehman Brothers Holdings, Inc. ("Lehman") filed for bankruptcy.  Because Lehman's debt securities were held by the Reserve Primary Fund, Lehman's bankruptcy filing triggered a run on the Fund.  On September 16, 2008, the net asset value of each of the Funds declined to below $1 per share, or "broke the buck."

11.    Following the events of September 15 and 16, 2008, over thirty lawsuits were filed against Counterclaim Defendant in state and federal courts throughout the country.  In addition, state and federal regulators opened investigations into the conduct of Counterclaim Defendant.

12.    As Counterclaim Defendant requested, and with its full knowledge and approval, WF&G mobilized a team of attorneys to represent Counterclaim Defendant in all such proceedings.  The amount of work required was significant and complex.  For example, on Counterclaim

Defendant's behalf, WF&G filed and responded to numerous dispositive motions, responded to significant document requests pursuant to Orders issued in both federal and state courts, responded to significant document demands from government regulators, defended numerous depositions, responded to emergency motions for preliminary injunctions and temporary restraining orders, and secured the transfer by the Judicial Panel on Multidistrict Litigation of all federal actions to the Southern District of New York.

13.    WF&G continued to represent RMCI in all such proceedings through and until April 9, 2009.  On April 9, 2009, Bruce Bent II sent a "formal notice" terminating WF&G's "legal representation of Reserve Management Company, Inc., Resrv Partners, Inc. and the Reserve International Liquidity Fund."  Bent II expressly acknowledged in writing that WF&G would continue to serve as counsel to the Reserve Funds in the aforementioned proceedings.

14.    WF&G regularly provided RMCI with detailed monthly invoices setting forth the hours worked by each attorney, a description of what legal services they had rendered, and their applicable billing rates.  WF&G's monthly bills also itemized all expenses incurred in connection with its representation of RMCI.

15.    Each monthly invoice was mailed to, and received by, RMCI at 1250 Broadway, New York, NY 10001.  Upon receipt of each billing statement, RMCI was obligated to remit payment, in full and in a timely manner, for the services rendered by WF&G to RMCI.

16.    Until December 2008, RMCI paid in full all amounts invoiced by WF&G and never objected to the amount of those bills.  No payment, however, has been received for services rendered by WF&G to RMCI from January 2009 through April 9, 2009.

17.     As of April 9, 2009, RMCI owed WF&G a principal balance of approximately $3.1 million.  WF&G has made repeated demands upon RMCI for payment of its outstanding balances due and owing.  No payment has been made by RMCI since December 2008.

18.     In January 2010, WF&G agreed to reduce the amount owed by RMCI to approximately $1 million, payable once RMCI is awarded advancement of expenses by the Court. WF&G received no consideration for this accord, has not received any satisfaction from RMCI, and RMCI has not performed.  This agreement is thus invalid or unenforceable, or has been breached by RMCI.

### First Cause of Action:  Breach of Contract

19.     WF&G incorporates and re-alleges Paragraphs 1-18 of the Counterclaims as if set forth in their entirety herein.

20.     WF&G and RMCI had an agreement by which WF&G agreed to provide legal services to RMCI on an ongoing basis in exchange for RMCI's promise to pay for legal fees and expenses related to the services performed.

21.     WF&G has fully performed the agreement by providing legal services upon RMCI's request and on its behalf.

22.     After rendering legal services, WF&G sent RMCI billing statements for prompt payment.  Through and until December 2008, RMCI paid for all legal services rendered and expenses incurred by WF&G.  Despite due demand therefore, RMCI has failed and refused to pay for the legal services rendered by WF&G, and the expenses relating to those services, from January 2009 through April 9, 2009.  RMCI has materially breached its contractual obligations by

failing to remit those required payments in full and has repudiated its contractual obligations by stating that it would not do so.

23.     WF&G has been damaged by RMCI's breach by committing its resources to perform legal services for which it has not received payment.

24.     Based upon RMCI's breach and the resulting damage to WF&G, WF&G seeks the recovery of $3,070,688.25 for unpaid legal fees and expenses, plus interest and less any applicable retainer.

<u>**Second Cause of Action:  Account Stated**</u>

25.     WF&G incorporates and re-alleges Paragraphs 1-18 of the Counterclaims as if set forth in their entirety herein.

26.     Between January and April 2009, WF&G submitted monthly invoices to RMCI seeking payment for services performed for RMCI and at its request.

27.     RMCI received and retained WF&G's monthly invoices and did not object to any of those bills within a reasonable time.  WF&G's invoices to RMCI give rise to an account due and owing from RMCI to WF&G.

28.     RMCI has not remitted payment for WF&G's invoices dated and mailed to RMCI on January 15, 2009, February 10, 2009, March 9, 2009, April 3, 2009, and April 29, 2009.

29.     WF&G has repeatedly demanded that RMCI pay the amount due.  RMCI, however, has paid no part of its balance due and owing.

30.     The balance due, owing, and unpaid from RMCI to WF&G is in the sum of $3,070,688.25 for unpaid legal fees and expenses, plus interest and less any applicable retainer.

**Third Cause of Action:  Quantum Meruit**

31.     WF&G incorporates and re-alleges Paragraphs 1-18 of the Counterclaims as if set forth in their entirety herein.

32.     From January through April 9, 2009, WF&G rendered good and valuable legal services in good faith to and on behalf of RMCI.

33.     RMCI requested WF&G's services and accepted the benefit of those services under circumstances in which both parties understood that WF&G had a reasonable and legitimate expectation of payment for providing those services.

34.     RMCI knew or reasonably should have known that WF&G expected payment for providing legal services.  RMCI, however, has not paid for the services rendered by WF&G from January through April 9, 2009.

35.     RMCI has received legal services for which the fair and reasonable value is set forth in WF&G's unpaid invoices.

36.     RMCI's request for and acceptance of WF&G's services without full payment entitles WF&G to recover the value of the services provided in the amount of $3,070,688.25 plus interest and less any applicable retainer.

**Fourth Cause of Action:  Declaratory Judgment under 28 U.S.C. §2201**

37.     WF&G incorporates and re-alleges Paragraphs 1-18 of the Counterclaims as if set forth in their entirety herein.

38.     WF&G and RMCI have no valid and enforceable agreement to reduce the amount of unpaid legal fees and expenses that are owed by RMCI

39.     RMCI has not satisfied and discharged its obligations to pay legal fees and expenses owed to WF&G.

40.     To the extent a valid and enforceable agreement to reduce the amount of unpaid legal fees and expenses that are owed by RMCI exists, that agreement has been breached by RMCI.

41.     An actual and justiciable controversy presently exists between WF&G and RMCI concerning the amount of legal fees RMCI owes to WF&G.

42.     WF&G seeks a declaratory judgment that the amount due, owing, and unpaid from RMCI to WF&G is in the sum of $3,070,688.25 for unpaid legal fees and expenses, plus interest and less any applicable retainer.

## PRAYER FOR RELIEF FOR COUNTERCLAIMS

WHEREFORE, WF&G respectfully requests, *inter alia*, the following relief:

A.     Judgment in WF&G's favor on each cause of action asserted in the above Counterclaims;

B.     A declaratory judgment that WF&G and RMCI have no valid and enforceable agreement to reduce the amount of unpaid legal fees and expenses that are owed by RMCI to WF&G;

C.     A declaratory judgment that the balance due, owing, and unpaid from RMCI to WF&G is in the sum of $3,070,688.25 for unpaid legal fees and expenses, plus interest and less any applicable retainer;

D.     Monetary damages to WF&G for the entire outstanding balance of WF&G's unpaid legal fees and disbursements, plus interest; and

E.       Such other and further relief as this Court deems just and proper, including costs and attorneys' fees.

Dated:  October 13, 2011                          Respectfully submitted,

                                                  CAHILL GORDON & REINDEL LLP

                                                  _____
                                                  Thomas J. Kavaler
                                                  Michael J. Wernke
                                                  Eighty Pine Street
                                                  New York, New York  10005
                                                  Telephone: (212) 701-3000
                                                  Facsimile: (212) 269-5420

                                                  *Attorneys for Defendants*